# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **JAMES E. HYMAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **No.** |
| **YESCARE CORP., VALITAS** ) | |
| **INTERMEDIATE HOLDINGS, INC.,** ) | **JURY DEMAND** |
| **CHS TX, INC., PERIGROVE, LLC,** ) | |
| **SARA TIRSCHWELL, SCOTT KING,** ) | |
| **ABRAHAM GOLDBERGER,** ) | |
| **YITZCHOK "ISAAC" LEFKOWITZ,** ) | |
| **and DAVID GEFNER,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff, for his complaint against Defendants, states to the Court as follows:

### I.      Summary of Action

1.      Plaintiff James E. Hyman is the former CEO of Valitas Health Services, Inc.

2.      After Mr. Hyman resigned from Valitas, in order to avoid paying Mr. Hyman (and various other creditors) the amounts to which they were contractually due, Defendants perpetrated a fraudulent transfer by implementing the controversial "divisional merger" under Texas law.

3.      Defendants merged what is now known as the "YesCare" family of companies into a single company, which company was then split into two entities: (1) Corizon Health, Inc. n/k/a Tehum Care Services, Inc., a shell company with virtually no assets that retained nearly all liabilities, and (2) CHS TX, Inc., which acquired nearly all of the assets without the most

significant liabilities. Significantly, Tehum is the company that was assigned the liability for Mr. Hyman's employment contract.

4. If Defendants follow the typical so-called "Texas Two-Step," Corizon Health, Inc. n/k/a Tehum Care Services, Inc., will soon file for bankruptcy, leaving Mr. Hyman (and various other creditors) without a meaningful remedy absent this Court's intervention.

5. Defendants have already represented on numerous occasions that they intend to put Tehum into bankruptcy.

6. For instance, although he was then the CEO, immediately after Mr. Hyman questioned a suspect $3 million wire transfer to a company insider for non-specific services, Mr. Hyman was instructed to take a leave of absence and told: "***We will deal in short order with your employment termination by all the options available to the company, either through a friendly severance or through aggressive litigation with you, or alternatively through a bankruptcy filing which will wipe out all of your claims***."

7. Indeed, YesCare's current litigation counsel is, according to his firm's website, "a bankruptcy litigator" who "has had a leading role in some of the largest and most complex restructurings in recent history." Further, counsel for YesCare recently represented that Corizon Health, Inc. n/k/a Tehum Care Services, Inc. is "on the verge" of bankruptcy.

8. Defendants acted in concert and conspired on a fraudulent scheme that was designed to strip YesCare's valuable assets from its significant liabilities and file a bankruptcy petition for the entity laden with those liabilities (Corizon Health, Inc. n/k/a Tehum Care Services, Inc.) to hinder and delay payment of those liabilities and use the bankruptcy process to delay and seek to avoid or reduce recoveries to Mr. Hyman and other creditors.

2

9.     What Defendants have done, and are still doing, is essentially an old-fashioned bankruptcy fraud scheme – taking assets and avoiding liabilities, while draining coffers into their own pockets – by misusing a controversial statute of a state with no relationship to the company, guided and directed by those who describe themselves as sophisticated bankruptcy litigators.

10.     The divisional merger was essential to this scheme, as it allowed CHS TX, Inc. and the overall YesCare enterprise to continue to operate outside of bankruptcy, while taking advantage of the bankruptcy process with respect to the vast majority of its creditors under the Tehum entity.

11.     Neither law nor equity countenances such schemes.

12.     Thus, this action seeks to hold Defendants liable for their fraudulent scheme to deprive Mr. Hyman of his rights under his employment contract, by seeking to unwind the divisional merger.

13.     Notably, Mr. Hyman is not the only party whose remedies have been jeopardized by Defendants' scheme. Again, Corizon Health, Inc. n/k/a Tehum Care Services, Inc., a shell company with virtually no assets, retained nearly all liabilities after the divisional merger, which liabilities include lawsuits filed by parties injured as a result of medical care provided, or denied, by Corizon.

14.     It is important to note that the Defendants are involved in the business of providing essential healthcare services to incarcerated individuals who reside in very close living quarters and have no freedom to obtain alternative health services. Literally tens of thousands of lives are potentially affected by Defendants' actions.

## II.    The Parties

15.    Plaintiff James Hyman is an individual resident of Connecticut. He is a former employee of a company known as "Valitas Health Services, Inc." and, pursuant to his employment agreement, is a current stockholder in both CHS TX, Inc. and Corizon Health, Inc. n/k/a Tehum Care Services, Inc.

16.    Defendant CHS TX, Inc. is a Texas corporation with its principal place of business in Brentwood Tennessee. Pursuant to a divisional merger, Valitas Health Services, Inc., Mr. Hyman's former employer, was merged into Corizon Health, Inc., which was then split into two entities: CHS TX, Inc. and Corizon Health, Inc. n/k/a Tehum Care Services, Inc. The latter acquired the liability under Mr. Hyman's employment contract, and the former acquired nearly all of the pre-merger assets. Both CHS TX, Inc. and Tehum Care Services, Inc. are part of the "YesCare" family of companies, and both are owned by Valitas Intermediate Holdings, Inc. CHS TX, Inc. sometimes uses the d/b/a "YesCare."

17.    Defendant YesCare Corp. is a Texas corporation with its principal place of business in Brentwood Tennessee. Although Defendants' structure is somewhat opaque, upon information and belief, YesCare Corp. is also a successor in interest to Valitas Health Services, Inc. and/or an alter ego of CHS TX, Inc. For example, although it was only recently formed, YesCare publicly represents in its marketing materials that, despite its corporate existence of less than one year, it has "40 years of experience as the leading provider of corrections healthcare" and "over 40 years, YesCare has provided expert medical, dental, and behavioral health services to more than 1,000,000 patients at 475 correctional facilities across the country." It also represents on its website (https://www.yescarecorp.com) that it acquired all of the employees and active contracts of Corizon Health in early 2022.

18.     YesCare Corp., CHS TX, Inc., Valitas Health Services, Inc., and Tehum Care Services, Inc. are collectively referred to herein as "YesCare."[1]

19.     Defendants Sara Tirschwell, Scott King, Abraham Goldberger, Yitzchok "Isaac" Lefkowitz, and David Gefner are all directors of one or more of the corporate Defendants.

20.     Perigrove, LLC is a New York limited liability company that holds itself out as a "a prolific private equity firm strategically diversified across every segment of the global healthcare sector." David Gefner is the founder and principal of Perigrove. Abraham Goldberger is also an officer, employee, and/or agent of Perigrove.

### III.     Jurisdiction and Venue

21.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 1332.

22.     This Court has personal jurisdiction over Defendants because Defendants are conducting business in the State of Tennessee and have otherwise availed themselves of the jurisdiction of this Court.

23.     This Court is the proper venue to hear this dispute pursuant to 28 U.S.C. § 1391(b).

### IV.     Facts

#### A.     Mr. Hyman's Employment Agreements

24.     Mr. Hyman is the former CEO of Valitas Health Services, Inc. Valitas was a company that provided healthcare services to incarcerated individuals.

---

[1] As required by his employment agreement, Mr. Hyman previously initiated an arbitration against YesCare Corp., among others, for breach of his employment agreement. However, YesCare Corp., through bankruptcy counsel, objected to jurisdiction of the AAA, claiming they are not subject to arbitration. Therefore, Mr. Hyman dismissed that entity and substituted Tehum in its place. This litigation was filed as a result of YesCare Corp. disputing jurisdiction of the AAA.

5

25.     Mr. Hyman has been employed in the role of CEO for several companies over the past decade and has served as a board member of nearly a dozen public and private companies, including Cornell Companies, Community Education Centers, TestAmerica, Inc., and Citizens Parking, Inc.

26.     Mr. Hyman also has extensive experience providing interim leadership to companies undergoing financial restructuring through his previous role as Senior Managing Director of FTI Consulting.

27.     On September 1, 2019, Mr. Hyman signed an Executive Employment Agreement with Valitas Health Services, Inc. to be its chief executive officer. At the time, Valitas Health Services, Inc. was one of the owners of Corizon Health, Inc. (**Exhibit 1**.)

28.     On October 27, 2020, Mr. Hyman signed an amendment to his employment agreement, which was effective September 3, 2020. That amendment vested Mr. Hyman with stock in Valitas Health Services, Inc. (**Exhibit 2**.)

29.     The amendment provided, in relevant part, that Mr. Hyman was entitled to resign "With Good Reason" upon the occurrence of various events. If he did so, he was entitled to various compensation enumerated in the contract.

### B.     The First Change in Control

30.     On June 30, 2020, the Flacks Group, a privately held investment firm, acquired Valitas Health Services, Inc. through a transaction in which it purchased its parent entity, Valitas Intermediate Holdings, Inc.

31.     As part of the transaction, two new entities were formed: M2 EquityCo, LLC and M2 HoldCo, LLC.

32.     M2 EquityCo, LLC purchased Valitas Intermediate Holdings, Inc. M2 EquityCo, LLC is a Florida limited liability company that was formed by James Gassenheimer, the former Chairman of the Valitas Board of Directors. Michael Flacks is listed as the manager of the company. The company is currently administratively dissolved.

33.     M2 EquityCo, LLC is owned by M2 HoldCo, LLC, which is a Florida limited liability company that was formed by James Gassenheimer. Michael Flacks is listed as the manager of the company. The company is currently administratively dissolved.

### C.     *The Second Change in Control and Mr. Hyman's Resignation as Officer*

34.     In December 2021, one or more persons or entities whose identities are unknown purchased Flacks Group's interest in M2 EquityCo, LLC and/or M2 HoldCo, LLC.[2]

35.     These new owners performed no due diligence.

36.     Defendants David Gefner and Isaac Lefkowitz, on behalf of Defendant Perigrove, served as "representatives" of the new owners throughout the buying process. Mr. Lefkowitz's actions described herein were all at the direction of Mr. Gefner and perhaps other Perigrove agents.

37.     Mr. Hyman met with Defendant Abraham Goldberger and Mr. Lefkowitz on December 1, 2021.

38.     As a condition of closing, Isaac Lefkowitz demanded that the CEO, CFO and CLO of Valitas Health Services, Inc. each submit a signed resignation from their positions as officers and board members of Valitas Health Services, Inc. and its subsidiaries.

39.     Mr. Lefkowitz concurrently, on December 3, 2021, represented via email that "we have no intention of making any employment changes in the company from CEO all the way down the flag pole." (**Exhibit 3**.) He made a similar representation in a December 5, 2021 email in which

---

[2] They rebranded the company as "YesCare" on or about January 1, 2022.

he said there would "[n]o changes" in response to Mr. Hyman's following question: "although the officers will change (eg Abe as President) for communications (internal,vcustomer) are you wanting us to still position me as CEO, Jeff as CFO, etc.?" (**Exhibit 4**.)

40.    Further, Scott King, Chief Legal Officer, assured Mr. Hyman that since the resignation was only a resignation of *title*, and not *employment*, he would suffer no employment-related consequences as a result. Mr. King sent an email on December 2, 2021, representing that "the Corizon officers will stay on in an employment capacity and I have noted that in the document pertaining to the officers." (**Exhibit 5**.)

41.    Upon information and belief, the above demands and representations were made in furtherance of the scheme to fraudulently isolate all liabilities, including employment contracts such as Mr. Hyman's, into a new shell entity, which is described in detail below.

42.    In fact, James Gassenheimer, then Chairman of the Valitas Board of Directors, who was a corporate attorney as well as a board member, threatened to sue officers for breach of fiduciary duty if they refused to sign their resignation as officers.

43.    Therefore, in reasonable reliance on the foregoing representations and under the duress of Mr. Gassenheimer's threat, Mr. Hyman signed the resignation as to his officer and board member status (though not his employment).

### D.    The Wire and the Fallout

44.    On December 8, 2021, Mr. Hyman discovered that Mr. Lefkowitz had ordered a wire transfer for $3 million be sent from Valitas to "Geneva Consulting, LLC" as a payment for future services vaguely described as "Corporate Restructuring."

45.    The consulting agreement with Geneva Consulting, LLC was signed by Mr. Lefkowitz on behalf of Valitas (though it is unclear if he had such authority at the time) and by

Jay Leitner on behalf of Geneva Consulting, LLC. Mr. Leitner is the Vice President of Special Operations for Defendant Perigrove. Defendant Perigrove and Geneva Consulting share the same address.

46.    Mr. Hyman emailed Mr. Lefkowitz and inquired about the $3 million payment to an entity apparently owned or controlled by Mr. Lefkowitz. To Mr. Hyman, this was a dissipation of Valitas' financial resources away from the daily health needs of its contracted clients, which could lead to a crisis for thousands of detainees and incarcerated prisoners.

47.    Less than ten minutes later, Mr. Lefkowitz responded that the payment was for "multiple Corizon litigation matters to get it settled before year end." Corizon, of course, was a separate entity at this time.

48.    Then, via letter dated December 9, 2021, Mr. Lefkowitz instructed Mr. Hyman to "refrain from making any material company decisions or issue any orders to any of the company and all its subsidiaries' staff until the interim board will have a chance to install a permanent governing body of directors and officers will have the opportunity to evaluate each of the former Corizon Health executives for their new role in the restructuring of the company." Mr. Lefkowitz signed the letter as "Interim CEO and Member of the Board."

49.    Upon information and belief, the $3 million wire was part of Defendants' scheme to redirect assets and silo liabilities into a shell company via the divisional merger discussed below.

50.    On December 10, 2021, Mr. Hyman sent an email to Mr. Lefkowitz, expressing his concern about how the transition was being handled:

> I take this opportunity to share a concern with you and the Board, that my refraining from engaging in my contractual duties, as you have directed in your letter, without my being advised who has been and who has not been consulted and/or notified of this intended course, may be an unwitting breach by the Company of important contractual and fiduciary duties to the Company's many stakeholders, who rely on

9

the uninterrupted continuity of the Company's operations and decision-making processes to deliver patient care and respond to customer concerns.

Mr. Hyman also reiterated that he remained willing to serve the company but stated that, "I believe it best if mutual consideration was given to my departure from Company employment." He concluded the email with a summary of the company's obligations under Mr. Hyman's employment agreement as a result of the "Change of Control," including a $2 million bonus.

51.     Mr. Lefkowitz responded approximately an hour later, instructing Mr. Hyman to take a leave of absence and stating as follows:

> Be also aware, should you in any way have any negative communication that impacts the company, we will hold you liable for such damages.
>
> We will deal in short order with your employment termination by all the options available to the company, either through a friendly severance or through aggressive litigation with you, or alternatively through a bankruptcy filing which will wipe out all of your claims . . . [we] will have to wait until the new CEO is in place and with the new governing body in place.

52.     Therefore, via letter dated December 8, 2021, Mr. Hyman provided detailed "Notice of Good Reason" of resignation under his employment agreement, which notice was supplemented on December 30, 2021 and January 10, 2022.

53.     Rather than accept Mr. Hyman's resignation, on January 13, 2022, Heather Adelman, joint counsel for Perigrove and Valitas, sent a letter to Mr. Hyman stating his employment was terminated "effective as of December 3, 2021, per [his] resignation letter" (even though, again, Mr. Hyman simply resigned from his roles as CEO and board member—that is, as officer—and not as an employee). (**Exhibit 6**.) The letter asserted that Valitas "accepted [Mr.

Hyman's] resignation as a courtesy ... to enable [his] graceful departure" even though Valitas considered his "termination to have been for Cause."[3]

54.    Prior to this letter, Mr. Hyman ***never*** received the requisite contractual notice claiming he was deficient in his performance, nor was he provided an opportunity to cure, as required by his agreements. Moreover, he never received notice that he failed to follow the Valitas Board of Directors' directives or policies.

55.    Mr. Hyman submitted a Notice of Resignation and a limited Release of Claims, in the form required by the Second Valitas Contract, on January 14, 2022.

56.    The Employment Agreements provide that if Mr. Hyman resigns with Good Reason, or if Valitas terminated his employment Without Cause, and Mr. Hyman abides by each of the deadlines and conditions set forth in that contract, he is entitled to certain enumerated payments and benefits. Thus, Mr. Hyman is due the following:

   a.   Unpaid Salary from December 31, 2021, through effective date of Mr. Hyman's Good Reason Resignation (approximately 90 days) (Exhibit 1, Section 6(c)(i));

   b.   Unpaid "Transaction Bonus" per the Second Valitas Employment Contract (Exhibit 2, Section 10);

   c.   Salary for 24 months as severance (Exhibit 2, Section 11(a));

   d.   Consulting Agreement Services with Marketing Strategies, LLC, or another LLC designated by Mr. Hyman, for 24 months (Exhibit 1, Section 6(d)(vi));

---

[3] The faulty reasoning underlying Ms. Adelman's assertion that Mr. Hyman had engaged in "Cause" for termination was that Valitas was in grave financial health, which was simply not one of the limited, contractually enumerated bases of "Cause for Termination." In fact, Valitas Health Services, Inc. was in grave financial circumstances for years before Mr. Hyman became affiliated with it, and the pandemic made its provision of health services to tens of thousands of incarcerated individuals, living in extraordinarily close quarters, that much more expensive, and in many instances, contractually non-reimbursable.

e.   Accrued but Unused Vacation (PTO) (Exhibit 1, Section 6(c)(ii));

f.   401k Match for Year 2021(Exhibit 1, Section 6(c)(iv));

g.   COBRA Family Health Insurance Payments (approximately 21 months) (Exhibit 1, Section 6(d)(ii));

h.   Incentive bonus (Exhibit 1, Section 6(d)(iii)).

57.   Shortly after Mr. Hyman resigned, another suspect transaction occurred.

58.   A company called Seven Trade, LLC purchased COVID test kits for immediate resale to YesCare at *a 57% markup* (for a total of just over $3.2 million).

59.   Upon information and belief, Seven Trade, LLC is an affiliate of Defendants Gefner, Lefkowitz, and Perigrove. It has the same address listed on the YesCare purchase order as the office of Defendant Perigrove. See https://www.perigrove.com/

### E.   The Texas Two-Step

60.   Although unfathomable to Mr. Hyman at the time, the reason for the new owners' lack of due diligence became clear over the ensuing months—the liabilities did not matter to them.

61.   Shortly after they purchased what they would eventually re-brand as "YesCare," the new owners used a novel process called a "divisional merger" to transfer all of its assets to a new entity called "CHS TX, Inc." and all of its liabilities (including Mr. Hyman's contract) to a new entity called "Tehum Care Services, Inc."

62.   Texas is one of just a handful of states that permits "divisional mergers." Tex. Bus. Org. Code § 1.002(55)(A).

63.   Unlike a traditional merger, a divisional merger involves one entity dividing into multiple entities. The assets and liabilities of the original entity are divided among the new entities.

64.     In the typical "Texas Two-Step," once the assets and liabilities are separated into two entities, the entity with the bulk of the liabilities files for bankruptcy, leaving creditors out in the cold and handing the shareholders a shiny new company that has been cleared of its debt.

65.     Due to the potential for abuse, there has been much debate over the propriety of this so-called "Texas Two-Step." Controversies and varying viewpoints aside, there is no known instance of any litigant employing the argument, either in or out of any court, that the "Texas Two-Step," wise or unwise, may be legally available as a means to commit fraud, as it is being used in this case.

66.     For example, the Two-Step is central to the Johnson & Johnson bankruptcy, aiming to separate talc liabilities from Johnson & Johnson's assets. Several U.S. Senators objected to this tactic, stating: "This bait-and-switch bankruptcy maneuver, known as the 'Texas two-step,' would protect Johnson & Johnson's profits and leave tens of thousands of cancer patients holding the bag . . . ."[4]

67.     The reason the Texas Two-Step has been labeled as a "bait-and-switch bankruptcy maneuver" is because, as two commentators observed: "The Texas divisive merger statute creates a fraudulent transfer conundrum, because it says movements of assets pursuant to a divisive merger are not transfers.  If there's no transfer, there's no fraudulent transfer liability [under section 548 of the Bankruptcy Code], as there must first be a transfer for there to be liability."[5]

---

[4] Durbin, Senate and House Dems Object to Johnson & Johnson Bankruptcy Maneuver, Demand Answers, Committee on the Judiciary, https://www.judiciary.senate.gov/press/dem/releases/durbin-senate-and-house-dems-object-to-johnson-and-johnson-bankruptcy-maneuver-demand-answers (last visited Nov. 28, 2022).

[5] [Texas Two-Step and the Future of Mass Tort Bankruptcy Series] The Texas Two-Step: The Code Says it's a Transfer, Harvard Law School Bankruptcy Roundtable, https://blogs.harvard.edu/bankruptcyroundtable/2022/07/19/texas-two-step-and-the-future-of-

68.     However, one of the few courts that have addressed this issue recently rejected a "Texas Two-Step" as "wholesale fraud."[6] *See In Re DBMP LLC*, Adv. Pro. No. 22-03000 (W.D.N.C. Bankr.). The court held that allowing a divisional merger to sidestep the fraudulent transfer provision of the Bankruptcy Code "would contradict another provision of the Texas statute, which states that a divisive merger is not meant to 'abridge any . . . rights of any creditor under existing law,' Tex. Bus. Orgs. Code § 10.901."[7] Regardless, as Professors Roe and Organek recently observed, "A divisive merger is a disposition of property and, hence, the [Bankruptcy] Code says it's a transfer, thereby triggering the opening prerequisite to there being a fraudulent transfer."

69.     In the instant case, on April 28, 2022, the new owners converted Corizon Health, Inc. into a Texas corporation and concurrently merged Valitas Health Services, Inc., among other entities, into Corizon Health, Inc.[8]

70.     Then, the new owners divided Corizon into two entities: (i) Corizon Health, Inc. and (ii) CHS TX, Inc.[9] pursuant to an Agreement and Plan of Divisional Merger. (**Exhibit 7**.)

71.     The Agreement and Plan of Divisional Merger provides that 100% of the capital stock of the new Corizon Health, Inc. entity shall be converted into: (i) 100% of the capital stock of Corizon Health, Inc., and (ii) 100% of the capital stock of CHS TX, Inc.

---

mass-tort-bankruptcy-series-the-texas-two-step-the-code-says-its-a-transfer/ (last visited Nov. 28, 2022).

[6] *Id.*

[7] *Id.*

[8] YesCare has no connection to Texas other than their incorporation. Corizon did not conduct any business in Texas when it began the merger, and following the merger, neither Tehum, CHS TX, nor YesCare conduct any business in Texas. Corizon, Tehum, and CHS TX all held their principal place of business at the same location in Brentwood, Tennessee.

[9] According to paragraph 8(a) of the Agreement and Plan of Divisional, CHS TX, Inc. is owned by Valitas Intermediate Holdings, Inc. As noted above, the LLC that owns Valitas Intermediate is dissolved, as is the LLC that owns that dissolved entity.

72.     Thus, because Mr. Hyman owned stock in Valitas Health Services, Inc. prior to the divisional merger, because Valitas Health Services, Inc. was merged into Corizon Health, Inc., which was then split into two entities, he now owns stock in both of those entities--Corizon Health, Inc. n/k/a Tehum Care Services, Inc. and CHS TX, Inc.

73.     Pursuant to the Agreement and Plan of Divisional Merger, all employees of Corizon Health, Inc. became employees of CHS TX, Inc.

74.     CHS TX was also granted nearly all of Corizon's assets, including all cash (other than $1 million set aside for Tehum), all fixtures and equipment, all service agreements, all assets of employee benefit plans, all trademarks and domains, all receivables, all real estate, all permits and licenses, and the Corizon Health Political Action Committee.

75.     Corizon, on the other hand, was allocated and remained laden with (a) liabilities of employee benefits plans; liability and responsibility for hundreds of pending lawsuits; $1 million in cash, (b) ownership of various Corizon Health subsidiaries that have no assets, (c) liability under various independent contractor, staffing, and employment contracts, including Mr. Hyman's contract, (d) the obligations under various service agreements, (e) liability under the home office lease in Brentwood, Tennessee, and various other leases, (f) the right to take out a $4 million loan from M2 LoanCo, LLC pursuant to a "funding agreement,"[10] and (f) the right to make certain insurance claims.

76.     Thus, pursuant to the Agreement and Plan of Divisional Merger, Corizon Health, Inc. abandoned hundreds of personal injury claims, dozens of employment claims, and tens of

_____

[10] M2 LoanCo, LLC is a Florida limited liability company formed by James Gassenheimer. Michael Flacks is listed as the manager of the company. The company is now administratively dissolved. "Funding agreements" like this one are common smoke screens in divisional merger schemes.

millions of dollars in trade debt, all of which it put into a new shell company, which was allocated only $1 million.

77.     If the new owners of YesCare follow the "bait-and-switch bankruptcy maneuver" that has become part and parcel of the Texas-Two-Step, Corizon Health, Inc. will soon declare bankruptcy.

78.     And in an apparent effort to avoid the type of negative publicity Johnson & Johnson received, the new owners changed the name of Corizon Health, Inc. to Tehum Care Services, Inc.

79.     In sum, from the outset, the primary objective of the divisional merger and forthcoming bankruptcy was to allow Defendants to operate outside of bankruptcy while subjecting Mr. Hyman and other creditors to the mandatory stay that would deprive such creditors of any recovery unless or until they consent to a chapter 11 plan of reorganization that resolves their claims for a fraction of the value.

### IV.     <u>Causes of Action</u>

#### A.     *Violation of the Uniform Fraudulent Transfer Act*

80.     Tennessee's Uniform Fraudulent Transfer Act provides that a transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tenn. Code Ann. § 66-3-305(a).

81.    In determining such actual intent, the statute instructs courts to consider various non-exclusive badges of fraud, including, most relevant in this case, whether (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) The debtor removed or concealed assets; (7) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (8) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

82.    Additionally, Tenn. Code Ann. § 66-3-306(a) provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

83. Tenn. Code Ann. § 66-3-306(b) provides: "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent."

84. As discussed above, pursuant to Defendant's Texas Two-Step scheme, Mr. Hyman's former employer, Valitas Health Services, Inc., merged with Corizon Health, Inc., which entity was then divided into two entities: Corizon Health, Inc. and CHS TX, Inc. Then, Corizon Health, Inc. (Tehum) was assigned Mr. Hyman's contract along with nearly all pre-merger liabilities, and CHS TX, Inc. received nearly all assets. There was no consideration paid for this transaction.

85. This transaction was fraudulent as to Mr. Hyman, whose claim arose before the transfer, because Valitas Health Services, Inc. made the transfer to an insider, CHS TX, Inc. (and/or did not receive a reasonably equivalent value in exchange for the transfer), and Valitas was insolvent at that time or it became insolvent as a result of the transfer. Indeed, Valitas no longer exists. Additionally, Defendants engaged in this transaction with actual intent to hinder, delay, or defraud Mr. Hyman and similarly situated creditors.

86. Thus, (a) prior to the divisional merger, Valitas had been threatened with suit by Mr. Hyman; (b) Defendants planned the divisional merger for the purpose of avoiding obligations to existing and future creditors; (c) the divisional merger was intentionally concealed from people both outside and within Defendants' organizations based on the opaque nature of the transaction itself; (d) Defendants intentionally engaged in the divisional merger to evade liabilities, including to Mr. Hyman; (e) the divisional merger allocated substantially all of the assets to CHS TX, Inc., leaving virtually nothing for Tehum and its creditors.

87. The divisional merger was intended to hinder and delay—for years— recoveries to creditors like Mr. Hyman, and to impair recovery through use of the bankruptcy process. The divisional merger created Tehum as an empty shell, with few (insufficient) assets, employees or operations, and wholly dependent on the other YesCare entities for any ability to pay its creditors. Defendants, therefore, effectuated the divisional merger with actual intent to hinder, delay, and defraud their creditors. Accordingly, the divisional merger should be avoided. *See, e,g*., *Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC)*, Nos. 20-30608 (JCW), 20-03041 (JCW), 2021 Bankr. LEXIS 2294, at *80 (Bankr. W.D.N.C. Aug. 23, 2021) ("if a corporation uses a divisional merger to dump its liabilities into a newly created 'bad' company that lacks the ability to pay creditors while its 'good' twin walks away with the enterprise's assets, a fraudulent transfer avoidance action lies.").[11]

### B.    Declaration of Unenforceability of Divisional Merger

88. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the divisional merger was invalid, as set forth below.

89. The Texas divisional merger statute ensures that, in accordance with the common law, divisional mergers cannot disadvantage creditors. The statute states, "This code does not . . . abridge any right or rights of any creditor under existing laws." Tex. Bus. Orgs. Code Ann. § 10.901.

---

[11] *See also* Cliff Ernst, *Steps to Accomplish a Divisional Merger, in Divisive [Sic] Mergers: How To Divide An Entity Into Two Or More Entities Under A Merger Authorized By The Texas Business Organization Code*, 2016 WL 10610449 (Tex. 2016) ("[O]ne could certainly imagine an egregious situation where all assets were allocated to one party to the merger and all liabilities were allocated to another party without assets and creditors might attempt to void the transaction as a fraudulent conveyance.").

90.     "[A] purpose of the statute was to enable mergers that did not adversely affect the rights of parties under preexisting contracts with the entities undergoing the mergers." *Plastronics Socket, Ltd. v. Hwang*, Nos. 2020-1739, 2020-1781, 2022 U.S. App. LEXIS 883, at *8 (Fed. Cir. Jan. 12, 2022) (holding "the Texas divisive merger statute does not enable an entity to eliminate royalty payments due under a contract with the predecessor entity. Plastronics Socket [original entity] cannot divest itself of the obligation to pay royalties on sockets sold with H-Pins" by allocating the contract to a new entity as part of a divisional merger)

91.     The legislative history confirms the intent that a "[c]reditor's rights would not be adversely affected by the proposed amendment, and creditors would continue to have the protections provided by the Uniform Fraudulent Transfer Act and other existing statutes that protect the rights of creditors." H. Comm. on Bus. & Com., Bill Analysis, H.B. 472, 71st Reg. Sess., at 23 (Tex. 1989).

92.     And one of the authors of the Texas merger statute reflected: "While the provisions permitting multiple surviving entities in a merger were intended to provide corporations with greater flexibility in structuring acquisition and restructuring transactions, they were not intended to have any material effect on the existing rights of creditors of the parties to a merger." Curtis W. Huff, *The New Texas Business Corporation Act Merger Provisions*, 21 St. Mary's L.J. 109, 122 (1989).

93.     Where, as here, a divisional merger materially prejudices a creditor, the creditor of the old entity may contest the merger, including the asset and liability allocations, and may seek to hold the new company responsible for those liabilities. *See, e.g.*, *In re Aldrich Pump LLC*, No. 20-30608 (JCW), 2021 Bankr. LEXIS 2294, 2021 WL 3729335, at *27-30 (Bankr. W.D.N.C. Aug.

23, 2021); *In re DBMP LLC*, No. 20-30080 (JCW), 2021 Bankr. LEXIS 2194, 2021 WL 3552350, at *24-26 (Bankr. W.D.N.C. Aug. 11, 2021).

94.    Therefore, Mr. Hyman seeks a declaration that the divisional merger is invalid under the Uniform Fraudulent Transfer Act and that the assets of Defendants should be reallocated in a manner that is fair and equitable.

### C.    *Declaration of Alter Ego*

95.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that, at all relevant times, YesCare Corp., Valitas Intermediate Holdings, Inc., and/or CHS TX, Inc. ("Alter Ego Defendants") were the alter egos of Valitas Health Services, Inc. (which eventually became Tehum) such that Valitas Health Services, Inc. was a mere instrumentality of the Alter Ego Defendants, and the corporate separateness of Valitas Health Services, Inc. and the Alter Ego Defendants should therefore be disregarded. As such, each Alter Ego Defendant must be held jointly and severally liable under Mr. Hyman's employment contract.

96.    The Alter Ego Defendants, through their common owners, completely dominated the finances, policies and business practices of Valitas Health Services, Inc., so that Valitas Health Services, Inc. had no separate existence of its own. The Alter Ego Defendants used their control over Valitas Health Services, Inc. to perpetrate the fraudulent transfer to the detriment of Mr. Hyman and similar creditors.

97.    A unity of interest in ownership and control has existed at all relevant times between the Alter Ego Defendants and Valitas Health Services, Inc., rendering each of the Alter Ego Defendants the alter ego of Valitas. As such, adherence to the fiction of Valitas' existence as an entity separate and distinct from the Alter Ego Defendants would permit an abuse of corporate privilege and would promote injustice.

98. Specifically, as discussed above, Valitas Health Services, Inc., among other entities, was merged with Corizon Health, Inc., which was then split into CHS TX, Inc. and Corizon Health, Inc. n/k/a Tehum Care Services, Inc. Both CHS TX and Tehum are owned by Valitas Intermediate Holdings, Inc., which is owned by a dissolved LLC that appears to have been formed specifically to buy Valitas Intermediate Holdings.

99. Further, YesCare Corp. operates and/or manages all of the business of Corizon Health, Inc. n/k/a Tehum Care Services, Inc. and CHS TX, Inc. and, in doing so, exercises complete control over those entities and uses those entities as mere instrumentalities of YesCare Corp.

100. There is also significant overlap in the managers of the Alter Ego Defendants and Tehum.

101. At the time of the divisional merger, the directors of CHS TX, Inc. were (1) Sara Tirschwell, (2) Scott King, (3) Jeff Sholey, and (4) Greg Ladele.

102. At the time of the divisional merger, the directors of Valitas Health Services, Inc. were (1) Sara Tirschwell, (2) Yitzchok "Isaac" Lefkowitz, (3) David Gefner, and (4) Abraham Goldberger.

103. At the time of the divisional merger, the directors of Corizon Health, Inc. n/k/a Tehum Care Services, Inc. were: (1) Sara Tirschwell, (2) Yitzchok "Isaac" Lefkowitz, (3) David Gefner, (4) Abraham Goldberger, (5) Scott King (Secretary), (6) Jeff Sholey (CFO), (7) Greg Ladele (CMO), and (8) Jennifer Finger (Assistant Secretary).[12]

---

[12] Mr. Hyman is also currently listed as the president of Tehum with the Texas Secretary of State as of the date of this filing.

104.    At the time of the divisional merger, Sara Tirschwell was the sole director of YesCare Corp. YesCare Corp. is owned 95% by YesCare Holdings, LLC and 5% by Sara Tirschwell.

105.    In addition, the protection provided to separate corporate entities should be disregarded, the corporate veil should be pierced, and the Alter Ego Defendants should be held liable for the liabilities of Tehum for the reasons discussed above and because (1) Tehum is grossly undercapitalized; (2) Tehum uses the same Brentwood, Tennessee business location as the other Defendants; (3) Tehum is simply an instrumentality or business conduit for YesCare Corp. and its affiliates to hold and litigate liabilities; (4) YesCare diverted corporate assets to the detriment of creditors and/or manipulated assets and liabilities pursuant to the divisional merger;[13] and (5) Tehum was formed and used to transfer to it the existing liability of other entities pursuant to the divisional merger.

106.    In short, the corporate veil should be pierced, and Defendants should be held liable for the liabilities of Tehum through avoidance of the divisional merger. In addition, Tehum, as the fraudulently created entity used simply to isolate liabilities that was completely dominated and controlled by Defendants by and through their officers, is the alter ego of Defendants. Tehum is a mere shell, instrumentality, and conduit by which Defendants carried out their plan to hinder, delay, and defraud creditors and to effectuate a constructive fraudulent transfer.

---

[13] For instance, the suspect $3 million wire transfer about which Mr. Hyman inquired on December 10, 2021, while he was CEO of Valitas, and which gave rise to a threat of denial of contract rights and interests by means of a bankruptcy court filing, was a wire transfer to Geneva Consulting LLC, an entity of unknown ownership, but which shared a New York City office address with Messrs. Gefner and Lefkowitz, who claimed "representative" status with the new owners of Valitas.

### D. Breach of Fiduciary Duty

107.    At the time of the divisional merger, Sara Tirschwell was a director and/or officer of CHS TX, Inc., YesCare Corp., Valitas Health Services, Inc., and Corizon Health, Inc. n/k/a Tehum Care Services, Inc.

108.    At the time of the divisional merger, Scott King was a director and/or officer of CHS TX, Inc. and Corizon Health, Inc. n/k/a Tehum Care Services, Inc.

109.    At the time of the divisional merger, Yitzchok "Isaac" Lefkowitz, David Gefner, and Abraham Goldberger were all directors and/or officers of Valitas Health Services, Inc. and Corizon Health, Inc. n/k/a Tehum Care Services, Inc.

110.    As officers and/or directors of the above-referenced entities, Tirschwell, King, Lefkowitz, Gefner, and Goldberger (collectively, the "Director Defendants") each owed fiduciary duties to Valitas Health Services, Inc. and/or, for the reasons set forth below, its creditors, including the highest obligation of care, loyalty, and good faith in managing and administering Valitas Health Services, Inc.'s affairs and the interests of Valitas Health Services, Inc.'s creditors.

111.    Valitas Health Services, Inc. was rendered insolvent as a result of the divisional merger.

112.    Because Valitas Health Services, Inc. was insolvent or was rendered insolvent by the divisional merger, the Director Defendants' fiduciary duties to Valitas Health Services, Inc. run to the benefit of Valitas Health Services, Inc.'s creditors, including Mr. Hyman.

113.    Once a director's fiduciary duties to creditors arise, a director is generally prohibited from taking advantage of his or her intimate knowledge of the corporate affairs and his or her position of trust for his or her own benefit and to the detriment of the creditors to whom he

or she owes the duties, and the director must treat all creditors of the same class equally by making any payments to such creditors on a pro rata basis.

114.    The duty of care required the Director Defendants to apprise themselves of all information relevant to their decisions and to carefully and critically consider that information. As set forth below and throughout this Complaint—including, particularly and without limitation, failing to carefully or critically consider the information provided, instead making choices to benefit the YesCare enterprise to the detriment of Valitas Health Services, Inc. and its creditors— the Director Defendants failed to uphold their duty of care and thus breached their duty of care.

115.    The duty of loyalty required the Director Defendants to act with undivided and unselfish loyalty to the corporation and/or—given Valitas Health Services, Inc.'s insolvency—its creditors, and to exercise proper oversight and avoid self-dealing transactions with respect to an insolvent Valitas Health Services, Inc., unless those transactions met the standard of entire fairness. As set forth below and throughout this Complaint, the Director Defendants failed to do so and thus breached their duty of loyalty.

116.    A director or officer acts in breach of the duty of good faith where the fiduciary (i) intentionally acts with a purpose other than that of advancing the best interests of the corporation or, in this case, the insolvent corporation's creditors; (ii) acts with the intent to violate applicable positive law; or (iii) intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his or her duties. As set forth below and throughout this Complaint, the Director Defendants breached their duty of good faith.

117.    While serving as officers and/or managers of Valitas Health Services, Inc., the Director Defendants also simultaneously held similar positions at other entities within the YesCare organization, as set forth above.

118.    As a result of the Director Defendants' dual and multiple roles at other entities within the organization, the Director Defendants were hopelessly conflicted and unable to fairly and adequately consider the interests of Valitas Health Services, Inc. and/or its creditors.

119.    As such, each of the Director Defendants, in breach of their fiduciary duties of care, loyalty, and good faith owed to an insolvent Valitas Health Services, Inc. and/or its creditors, abdicated their roles as corporate fiduciaries to Valitas Health Services, Inc.'s creditors and instead acted solely in the interest of Valitas Health Services, Inc.'s affiliates and parent companies, including CHS TX, Inc., Corizon Health, Inc., and YesCare Corp.

120.    Indeed, some of the very agreements that the various entities entered into in connection with the divisional merger were between insiders, lacked any meaningful negotiation, and were driven by the upper management of YesCare and its various companies for the benefit of the parent entities and the directors and to the detriment of Valitas' creditors.

121.    The Director Defendants thus breached the fiduciary duties owed to Valitas Health Services, Inc.'s creditors when they participated in the divisional merger and, without considering any other options, to the detriment of Valitas Health Services, Inc. and/or its creditors and to the benefit of Valitas Health Services, Inc.'s affiliates and parents.

122.    The Director Defendants abdicated and disregarded their roles as corporate fiduciaries of Valitas and/or its creditors and instead acted solely in the interests of Valitas' affiliates and parent companies (including CHS TX, Inc., Corizon Health, Inc. n/k/a Tehum, and YesCare Corp.).

123.    The Director Defendants not only lacked independence but acted with gross negligence, with malice, with reckless indifference, and/or in bad faith, and thus engaged in willful

and wanton conduct when they entered into the divisional merger in breach of their fiduciary duties owed to an insolvent Valitas Health Services, Inc. and/or its creditors.

124.     The conduct of the Director Defendants in engaging in the divisional merger and saddling Corizon Health, Inc. n/k/a Tehum with Valitas Health Services, Inc.'s liabilities cannot be attributed to any rational business purpose as to Valitas Health Services, Inc. and/or its creditors.

125.     The Director Defendants recklessly disregarded the fact that they were acting in a manner adverse to the interests of Valitas Health Services, Inc.'s creditors.

126.     The conduct of the Director Defendants summarized above, among others, constituted breaches of their fiduciary duties, including but not limited to their duties of loyalty, care, and good faith.

127.     As a direct and proximate result of the Director Defendants' breaches of their fiduciary duties, Valitas Health Services, Inc. and/or its creditors suffered significant damages in an amount to be proven at trial.

### E.     Aiding and Abetting

128.     As described above, the Director Defendants breached their fiduciary duties owed to Valitas Health Services, Inc. and/or its creditors.

129.     To the extent each Director Defendant was not personally involved in the breaches of fiduciary duty, including the divisional merger scheme, those remaining Director Defendants ("Aiding and Abetting Defendants") knew that the other Director Defendants owed fiduciary duties to Valitas Health Services, Inc. and/or its creditors and were breaching those duties in connection with the divisional merger and otherwise.

130.     As an alternative to their direct conduct, the Aiding and Abetting Defendants colluded in and aided and abetted those breaches of fiduciary duties and the Aiding and Abetting

Defendants were active and knowing participants in and substantially assisted and/or encouraged those breaches of fiduciary duties in a variety of ways set forth throughout this Complaint.

131.    As such, by directing and knowingly participating in the breaches of fiduciary duties by the Director Defendants, the Aiding and Abetting Defendants are liable for aiding and abetting breaches of fiduciary duties owed to Valitas Health Services, Inc. and/or its creditors.

132.    For example, the Aiding and Abetting Defendants conceived, designed, and structured all aspects of the divisional merger and did so in a way that was not in the best interests of Valitas Health Services, Inc. and/or its creditors, but in the best interests of Valitas Health Services, Inc.'s parent companies and affiliates.

133.    The Aiding and Abetting Defendants exerted dominion and control over the remaining Director Defendants and Valitas Health Services, Inc. in connection with the divisional merger in such a way as to harm Valitas Health Services, Inc. and/or its creditors and assisted the Director Defendants in facilitating and/or causing the divisional merger to the detriment of Valitas Health Services, Inc. and/or its creditors.

134.    Upon information and belief, the decision to execute the divisional merger was not made by the Director Defendants after exercising their independent judgment and acting in the best interests of Valitas Health Services, Inc. and/or its creditors; rather, it was made and directed by the Director Defendants for the benefit of other entities in the YesCare family and to the detriment of Valitas Health Services, Inc. and/or its creditors.

135.    By directing and instructing the Director Defendants to authorize Valitas Health Services, Inc.'s divisional merger, whether in whole or in part, the Aiding and Abetting Defendants knowingly participated in and substantially assisted the Director Defendants' breaches of fiduciary duties described above.

136.    In addition, the Aiding and Abetting Defendants knowingly participated in and substantially assisted the Director Defendants' breaches of fiduciary duties by entering into the funding agreement discussed above, among others, as part of the overall fraudulent divisional merger scheme. That agreement was  not an "arm's length" contract.

137.    The actions of the Aiding and Abetting Defendants in knowingly participating and substantially assisting in the Director Defendants' breaches of fiduciary duties summarized above and throughout this Complaint were undertaken with gross negligence, with malice, with reckless indifference, and/or in bad faith, and thus constitute willful and wanton conduct.

138.     As a direct and proximate result of the Director Defendants' breaches of their fiduciary duties, as aided and abetted by the Aiding and Abetting Defendants, Valitas Health Services, Inc. and/or its creditors suffered significant damages in an amount to be proven at trial.

### F.    Tortious Interference

139.    Defendants Perigrove, Lefkowitz and Gefner acted in concert to tortiously interfere with Mr. Hyman's employment agreements. They did this prior to the purchase of Corizon by the unknown buyer, as well as after, but all their acts were in furtherance of their own interests and/or those of Perigrove, not the interest of Valitas.

140.    Perigrove, Lefkowitz and Gefner had knowledge of Mr. Hyman's employment agreements.

141.    Perigrove, Lefkowitz and Gefner intended to induce the breach by requiring Mr. Hyman to resign his officer position under false pretenses and by causing Valitas to terminate the employment agreements without cause and without accepting Mr. Hyman's resignation, while not paying Mr. Hyman his contractually entitled payments and benefits.

142. Perigrove, Lefkowitz and Gefner acted maliciously in their treatment of Mr. Hyman. In addition to the false statements made to induce his resignation of his officer position on the eve of the closing, they also acted to end his employment once he made inquiry about the $3 million payment to Geneva Consulting, an affiliate of Perigrove.

143. Furthermore, Lefkowitz intentionally induced a breach of Mr. Hyman's employment agreements by interfering with Hyman's ability to fulfill his contractual obligations. In Lefkowitz's December 9th email, Lefkowitz instructed Mr. Hyman to cease making material company decisions.

144. Moreover, in response to Mr. Hyman asserting his rights under the employment agreements and inquiring about the suspicious $3 million payment, Perigrove and its representatives maliciously threatened Mr. Hyman with "aggressive litigation" or a "bankruptcy filing."

145. The actions of Perigrove, Lefkowitz and Gefner proximately caused Valitas to breach Mr. Hyman's employment agreements.

146. Their actions were without privilege or justification.

147. Additionally, there was never formal Valitas board action to terminate Mr. Hyman's employment agreements. There was only the unauthorized acts of Perigrove and its agents.

148. Perigrove, Lefkowitz and Gefner are responsible for all damages suffered by Mr. Hyman from the breach of contract, including attorneys' fees, which damages should be trebled in accordance with Tenn. Code Ann. § 47-50-109.

### G. Promissory Fraud

149. Mr. Hyman sues Mr. Lefkowitz, Perigrove, and Mr. King for promissory fraud.

150.    As discussed above, Isaac Lefkowitz, on behalf of Perigrove, represented that "we have no intention of making any employment changes in the company from CEO all the way down the flag pole" and that there would be "no changes" to Mr. Hyman's employment.

151.    Similarly, Scott King assured Mr. Hyman that he would suffer no employment-related consequences as a result. Specifically, Mr. King represented that "the Corizon officers will stay on in an employment capacity and I have noted that in the document pertaining to the officers."

152.    Mr. Lefkowitz and Mr. King had no present intention to carry out these promises. As discussed above, they did in fact intend to make employment changes in the company and it was not true that the Corizon officers—among them Mr. Hyman—would stay on in an employment capacity.

153.    Mr. Hyman reasonably relied on these representations when he signed the resignation as to his officer and board member status.

154.    As a result of his resignation, Mr. Hyman was damaged.

### H.    Civil Conspiracy

155.    Messrs. Lefkowitz, King, and Gassenheimer had a common design to accomplish an unlawful purpose by concerted action and by unlawful means the interference with Mr. Hyman's employment contract, as discussed above.

156.    They did so through the fraudulent misrepresentations of King and Lefkowitz and the threat of Mr. Gassenheimer, all as set forth above.

157.    In doing so, King and Gassenheimer acted outside the scope of their relationship, if any, with the Alter Ego Defendants and/or Valitas Health Services, Inc., and they engaged in their conspiratorial conduct to further their own personal purposes.

31

158. As a result of this conspiracy, Mr. Hyman was damaged because his employment was terminated.

WHEREFORE, Plaintiff demands:

1. A jury of six (6) to try this case;

2. Compensatory damages of at least $5 million or an amount the jury deems fair and reasonable, trebled pursuant to Tenn. Code Ann. § 47-50-109 with respect to Mr. Hyman's tortious interference claim;

3. A declaratory judgment, as set forth above;

4. All available remedies under the Tennessee Uniform Fraudulent Transfer Act, including, without limitation,

    a. Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

    b. An attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by title 26;

    c. Subject to applicable principles of equity and in accordance with applicable rules of civil procedure:

    d. An injunction against further disposition by the debtor or a transferee, or both, of the assets transferred or of other property;

    e. Appointment of a receiver to take charge of the assets transferred or of other property of the transferee; or

    f. Any other relief the circumstances may require.

5. Attorneys' fees;

6. Punitive damages for Defendants' intentional, fraudulent, malicious, or reckless conduct, as set forth above;

7. To the extent any Defendant is a successor to Valitas Health Services, Inc. and bound by the terms of Mr. Hyman's employment agreements, an order compelling such Defendant to participate in the pending arbitration;

8. Pre- and post-judgment interest;

9. That Plaintiff be awarded such other and further relief as is just.

Respectfully submitted,

s/ Michael A. Johnson
Michael A. Johnson (#30210)
Casey R. Malloy (#38440)
KAY GRIFFIN, PLLC
222 Second Avenue North, Suite 340-M
Nashville, Tennessee 37201
(615) 742-4800
mjohnson@kaygriffin.com
cmalloy@kaygriffin.com
*Attorneys for Plaintiff*

33