# EXECUTIVE EMPLOYMENT AGREEMENT

THIS EXECUTIVE EMPLOYMENT AGREEMENT ("Agreement") is entered into by and between James E. Hyman (the "Executive") and Valitas Health Services, Inc. (the "Company") effective as of September 3, 2019 (the "Effective Date").

WHEREAS, the Executive desires to be employed by the Company as the Company's chief executive officer ("CEO") and the Company desires to employ the Executive as CEO; and

WHEREAS, this Agreement sets forth the terms and conditions of the Executive's employment with the Company;

THEREFORE, the Executive and the Company hereby agree as follows:

1.      **EMPLOYMENT**.

(a)      The Company shall employ the Executive and the Executive shall accept employment as the CEO of the Company as of the Effective Date.  The Executive shall have all the duties, responsibilities and authority customarily attendant to the position of CEO and shall render services consistent with such position on the terms set forth herein and shall report to the Company's Board of Directors (the "Board").  In addition, the Executive shall have such other executive and managerial powers and duties with respect to the Company as may reasonably be assigned to him by the Board, to the extent consistent with his position and status as set forth herein.  During the Employment Period (as defined below), the Executive shall serve as a member of the Board, and upon the termination of the Executive's employment for any reason, the Executive shall resign as a director of the Company and its affiliates.

(b)      The Executive agrees to devote substantially all of his working time and best efforts to the business and affairs of the Company, subject to periods of vacation and other leave to which he is entitled, and shall not engage in activities that substantially interfere with such performance; provided that the foregoing shall not prevent the Executive from serving on the corporate, civic and charitable boards set forth on Appendix 1 hereto, and any substitute boards (but in any event, no more than three corporate boards) subject to approval by the Board (which shall not be unreasonably withheld), so long as such activities in the aggregate do not interfere or conflict with the Executive's duties hereunder or create a potential business or fiduciary conflict.

2.      **TERM OF AGREEMENT**.  The "Employment Period" shall commence on the Effective Date and shall continue until terminated in accordance with Section 6 below.

3.      **LOCATION**. The Executive shall be based out of his home office in Stamford, CT, although he understands and acknowledges that he will be required to engage in travel to the Company's corporate office in Brentwood, Tennessee and other locations on Company business consistent with his position, and shall be entitled to expense reimbursement in accordance with Section 5(c) below.  Notwithstanding the foregoing, the Company has the right to request that the Executive relocate the Executive's principal place of employment to the Company's Brentwood, Tennessee headquarters. In that event, if the Company and the Executive mutually agree that the Executive's relocation is in the best interests of the Company, then the parties will engage in good

faith discussions in order to mutually agree on the timing, logistics, and relocation costs or reimbursements to be paid by the Company in connection with the relocation, including the provision of a Company-provided automobile. Notwithstanding anything set forth in this Section 3 to the contrary, the Executive will spend no more than 25% of his work time working from his Connecticut office, unless the Board has consented to his doing otherwise.

4. **COMPENSATION**.

(a)  Base Salary.  Effective as of the Effective Date, the Company shall pay the Executive a base salary ("Base Salary") at an initial annual salary rate of $850,000, payable in accordance with the Company's regular payroll practices relating to salaried employees. On the first and second anniversary dates of the Effective Date, the Base Salary shall increase by 3% (over the prior year's Base Salary), and increases in any subsequent years, if any, shall be negotiated with and at the sole and absolute discretion of the Board. If the Board determines not to increase the Executive's Base Salary in any subsequent years, then the Executive shall nevertheless receive a Base Salary increase equal to the increase in the Consumer Price Index for All Urban Consumers (commonly, the "CPI-U") since the prior anniversary of the Effective Date.

(b)  Incentive Bonus.   For each calendar year during the Executive's employment, the Executive shall be eligible to participate in the Company's annual incentive bonus plan (the "Incentive Bonus"). The Incentive Bonus shall be measured against predetermined goals or performance objectives established by the Board, based on reasonable stretch goals and objectives, and communicated to the Executive, with a target Incentive Bonus of 50% of the Base Salary for the applicable year. The Executive will have the right to receive an actual Incentive Bonus greater than 50% of Base Salary (up to a maximum of 100% of Base Salary) for over-performance, according to a performance schedule determined by the compensation committee of the Board. The Incentive Bonus will be pro-rated for the first year of service based on actual length of service. The Incentive Bonus, if any, for a particular year shall be payable after the Company has completed its audit for the applicable calendar year and on such date as the Company pays annual bonuses to its other executive officers, subject to the Executive's continued employment through the date on which the Incentive Bonus is actually paid and provided that the Executive has not breached any material provision of this Agreement or any other written agreement with the Company or any of its affiliates, subject to and except as otherwise provided in Section 6(d) below.

(c)  Restricted Stock Award Agreement.  The Executive shall be entitled to a grant of restricted stock subject to and in accordance with the Restricted Stock Award Agreement attached as Exhibit A to this Agreement (the "Restricted Stock Award Agreement").

(d)  Transaction Bonus.  In the event of a Change in Control (as defined in the Company's Long Term Incentive Plan) that occurs on or at any time following January 1, 2020, if the Executive (or any permitted transferee(s)) receives less than $1.3 Million in value in the aggregate (including in such determination, for the avoidance of doubt, any amounts released from an escrow or any amounts attributable to any earn-out) with respect to any then-outstanding restricted stock awards, including the Restricted Stock Award Agreement, then he shall receive the difference between the aggregate pre-tax value of what he (or any permitted transferee(s))

2

receives with respect to such restricted stock awards and $1.3 Million, which shall be paid by the Company in the form of a Transaction Bonus (subject to applicable taxes and withholdings), within 30 days from the date of the Change in Control or, if later, within 30 days from the last to occur of the release from the escrow or the payment of the earn-out (or a determination that no earn-out will be so earned).

(e)    Deductions and Withholdings.  All payments made under this Agreement shall be subject to applicable deductions and withholdings required by law and authorized by the Executive.

5.    **FRINGE BENEFITS**.

(a)    General. The Executive shall be eligible to participate in or receive benefits under any employee benefit plan or arrangement now or in the future made available by the Company generally to its executive employees (on terms consistent with those provided to the Company's other executive employees), subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements, including but not limited to 401(k), insurance and health insurance benefits.  Nothing in this Agreement shall affect the Company's right to change insurance carriers and to adopt, amend, terminate, or modify such plans and arrangements at any time.

(b)    Vacation. The Executive shall be entitled to take 4 weeks of paid vacation annually.  The terms and conditions of such vacation and all other forms of leave, including accrual rates, carry-over, and payout, shall be as set forth in the Company's vacation and leave policies, as they may exist and be amended from time to time.  The Executive shall also be entitled to all paid holidays given by the Company in accordance with the Company's regular paid holidays policy, as it may exist and be amended from time to time.

(c)    Business Expenses.  The Company shall promptly reimburse the Executive for all reasonable expenses incurred by the Executive in the performance of his duties under this Agreement, including all reasonable travel expenses; provided that such expenses are incurred and accounted for in accordance with the Company's policies and procedures, as they may exist and be amended from time to time.

(d)    Director and Officer Liability Insurance.  The Executive shall be covered under the Company's director and officer liability insurance coverage to the same extent as and consistent with the Company's other directors and officers.

(e)    Reimbursement of Legal Fees.  The Company shall reimburse the Executive for the Executive's reasonable attorneys' fees in connection with negotiating and reviewing this Agreement, the Restricted Stock Award Agreement, and other written agreements between the Executive and the Company, up to a maximum of $40,000.

US 165358964v4
US 165917597v1

## 6. TERMINATION

(a) <u>Permitted Terminations</u>. The Executive's employment hereunder may be terminated for any reason or no reason, including the following:

i. <u>Death</u>. The Executive's employment shall terminate upon the Executive's death without any further notice or action required by the Company or the Executive's legal representatives.

ii. <u>By the Company</u>. The Company may terminate the Executive's employment in the following circumstances:

(A) <u>Disability</u>. For the purposes of this Agreement, "Disability" means the Executive's substantial inability, by virtue of physical or mental illness, injury, disability, or other similar incapacity, to perform his material duties hereunder for a period of 30 days (whether or not consecutive) in any 12-month period; <u>provided</u> that until such termination, the Executive shall continue to receive the Executive's compensation and benefits hereunder, reduced by benefits payable, if any, under any disability insurance policy or plan. This Section 6(a)(ii)(A) shall be interpreted and applied so as to comply with the provisions of the American with Disabilities Act (to the extent that it is applicable) and any applicable state or local laws.

(B) <u>Without Cause</u>. The Company shall have the right to terminate the Executive's employment without Cause, upon 60 days prior written notice to the Executive. For the avoidance of doubt, the Company has the right to exercise its rights under this section for any reason or no reason and has the right (but not the obligation) to tell the Executive that he is relieved of all duties during the 60-day notice period (while continuing to pay the Executive's Base Salary and provide him all fringe benefits and stock vesting according to the terms of Sections 4 and 5 and the Restricted Award Stock Agreement for the 60-day notice period).

(C) <u>Cause</u>. The Company shall have the right to terminate the Executive's employment hereunder immediately for Cause (subject to any cure periods and notice requirements set forth in this Section 6(a)(ii)(C)). In the event of a termination for Cause, if the Executive shall then be a member of the Board, he shall immediately resign from such position and from all other positions held by the Executive with the Company or its affiliates. For purposes of this Agreement "<u>Cause</u>" shall mean the Executive's: (1) material failure to observe and comply with any of the Company's material written policies, including without limitation its policies prohibiting harassment (sexual or otherwise) and discrimination and its policies regarding equal employment opportunity and maintenance of an alcohol and drug-free work place, to the satisfaction of the Board; (2) continued failure to substantially perform his material duties with the Company (other than any such failure resulting from Executive's incapacity due to Disability, the employment termination provisions of which are described above), which is not cured within five calendar days after receipt by the Executive of written notice of such failure; (3) willful failure to carry out, or comply with, in any material respect any lawful and reasonable written directive of the Board, which is not cured within five calendar days after receipt by the Executive of written

4

notice of such failure; (4) commission at any time of any act or omission that results in, or that may reasonably be expected to result in, a conviction, plea of no contest or imposition of unadjudicated probation for any felony or other crime involving moral turpitude; (5) commission at any time of any act or omission that results in the Executive's incarceration in a federal, state, or local jail or prison for more than 72 hours; (6) commission at any time of any act of fraud, dishonesty, embezzlement, misappropriation, gross neglect or gross misconduct, or breach of fiduciary duty against the Company or any of its parent, subsidiary, or affiliate entities (collectively, "Affiliates") (or any predecessor thereto or successor thereof) or in the performance of the Executive's duties or responsibilities to the Company; or (7) material or willful breach of this Agreement, which, if curable, is not cured within 15 calendar days after receipt by the Executive of written notice of such breach.

           iii.     <u>By the Executive.</u>  The Executive shall have the right to terminate his employment for any reason upon 60 days prior written notice to the Company; <u>provided, however</u>, that the Company has the right (but not the obligation) to tell the Executive that he is relieved of all duties during the 60-day notice period (while continuing to pay the Executive's Base Salary for the 60-day notice period).  A termination of employment by the Executive shall be considered to be for "<u>Good Reason</u>" only if any of the following circumstances occur without the Executive's prior written consent and without being cured by the Company within 10 business days after written notice from the Executive to the Company specifying the applicable section of this Agreement (the "Cure Period"):

           (A)     A reduction in the amount of the Executive's Base Salary;

           (B)     A material reduction in the Executive's title, authority, or reporting relationship with the Board;

           (C)     A required relocation (without the Executive's agreement) of the Executive's principal place of employment as specified under Section 3, above, of more than 50 miles from such principal place of employment without a prior written agreement as to all terms regarding that subject;

           (D)     A Change in Control (as defined in the Company's Long Term Incentive Plan); or

           (E)     A material breach by the Company of any of the Company's obligations under this Agreement.

     Notwithstanding the foregoing provisions, Good Reason shall exist only if (x) the Company is provided written notice of the specific circumstances alleged to constitute Good Reason within 60 days of the initial existence of the circumstances, and (y) the Executive resigns within 30 days following the end of the Cure Period.  Any resignation that does not meet all of the foregoing requirements shall not be deemed for Good Reason.

           (b)     <u>Date of Termination</u>. "<u>Date of Termination</u>" means:

           i.     if the Executive's employment is terminated because of death, the

5

date of the Executive's death;

    ii. if the Executive's employment is terminated for any other reason, the date specified in a properly delivered written notice by the Company or the Executive, as the case may be; <u>provided</u>, <u>however</u>, that the date specified in the written notice shall not be a date prior to the date such notice is given or the expiration of any required notice or cure period; and <u>provided further</u> that in the case of termination by the Executive, the Executive may not elect to use any accrued vacation or other paid leave to avoid working during the notice period, nor may the Executive otherwise cease reporting to work during the notice period, in either case unless agreed to by the Company in writing.

   (c) <u>Accrued and Unpaid Benefits Upon Termination</u>. Following the termination of the Executive's employment with the Company by the Executive or the Company for any reason, the Executive (or the Executive's legal representative or estate if termination is because of death) shall receive:

    i. any earned, but unpaid, Base Salary through the Date of Termination;

    ii. the cash equivalent of any accrued, but unused, vacation through the Date of Termination if required by law or the Company's written benefits policies then in effect;

    iii. any amounts owing to the Executive for reimbursement of expenses properly incurred by the Executive prior to the Date of Termination which are reimbursable in accordance with Section 5(c);

    iv. any accrued and vested employee benefits, subject to the terms of the applicable employee benefit plans; and

    v. any earned, but unpaid Transaction Bonus, payable in accordance with Section 4(d).

   The amounts payable under subparagraphs 6(c)(i) – (v) (the "<u>Accrued Benefits</u>") shall be paid at the time such payments would otherwise be due under the Company's regular payroll practices, applicable Company policies or plans, or as provided by applicable law or earlier if otherwise provided in this Agreement.

   (d) <u>Additional Termination Benefits</u>. Following the termination of the Executive's employment by the Company without Cause or by the Executive for Good Reason, the Company shall pay, in addition to the Accrued Benefits, the following "<u>Additional Termination Benefits</u>":

    i. a continuation of Base Salary (then in effect) for 12, 18 or 24 months after the Date of Termination, the duration of the continued payments to be determined in accordance with Subsection 6(d)(v), below (the "<u>Severance Payment</u>"); <u>provided</u>, <u>however</u>, that the Executive's entitlement to the Severance Payment (and all of the other Additional Termination

6

Benefits outlined below) is contingent upon (x) the Executive's executing and not revoking a general release of claims in the form attached hereto as Appendix 2 (the "General Release"), which the Executive shall deliver to the Company within 21 days (or 45 days, if applicable) of any termination of employment; and (y) the Executive's compliance with the terms and conditions of this Agreement, including the covenants contained in Section 7 below, and the General Release. Notwithstanding payment timing provisions to the contrary in this Agreement but still subject to the requirements of the preceding sentence, the Severance Payment will be made in equal installments on the Company's regular payroll dates, with the first payment being made on the first payroll date occurring on or after the 60th day following the Executive's Date of Termination; provided that, any payments which would otherwise have been payable during such 60-day period shall be paid in a lump sum on such first payroll date, with the remainder payable over the 12-month period following the Date of Termination ("Severance Period").

       ii.      In addition to the Severance Payment, should the Executive timely elect and be eligible to continue receiving group health insurance pursuant to COBRA, the Company agrees to reimburse the Executive for the Company's share of COBRA premiums (equivalent to what the Company would have paid towards coverage had the Executive remained employed) during the Severance Period, or until such earlier time that the Executive becomes eligible for alternative coverage.

       iii.      In addition to the Severance Payment, in the event that the Executive's employment is terminated by the Company Without Cause pursuant to Section 6(a)(ii)(C) or by the Executive for Good Reason pursuant to Section 6(a)(iii), in either case such termination taking place after January 1 but prior to the time that incentive bonuses are paid by the Company for the immediately preceding and completed calendar year, the Executive shall be entitled to the incentive bonus (if any) that would have been earned and payable for the immediately preceding and completed calendar year based on the achievement of goals and objectives set forth in and in accordance with Section 4(b).

       iv.      In addition to the Severance Payment, in the event that the Executive's employment is terminated by the Company Without Cause pursuant to Section 6(a)(ii)(C) or by the Executive for Good Reason pursuant to Section 6(a)(iii), in either case such termination taking place after July 1 but prior to the time that incentive bonuses are paid by the Company, the Executive shall be entitled to a pro rata incentive bonus (if any) that would have been earned based on a pro rata achievement of goals and objectives through the termination date pursuant and subject to Section 4(b), payable within sixty (60) days of the Date of Termination.

       v.      In the event that the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason (x) after the Executive has been employed for 12 months but less than 18 months, then the Severance Payment and the Severance Period shall be increased to 18 months, or (y) after the Executive has been employed for at least 18 months, then the Severance Payment and the Severance Period shall be increased to 24 months.

       vi.      The Company and the Executive's consulting firm, Marketing Strategies, LLC, will enter into an agreement for Marketing Strategies, LLC to provide consulting services to the Company, in a form to be agreed upon within ten (10) business days of the start

7

date of the consulting services (but in any event, no more than thirty (30) business days following the Executive's Date of Termination) (the "Consulting Agreement"). The Consulting Agreement will include, *inter alia*, the following terms and provisions: (a) a term of twelve (12) months and a fee structure of $35,500 per month, in the event that the consulting services begin on or before October 1, 2020; (b) a term of eighteen (18) months and a fee structure of $36,500 per month, in the event that the consulting services begin after October 1, 2020 and on or before April 1, 2021; (c) a term of twenty-four (24) months and a fee structure of $37,500 per month in the event that the consulting services begin after April 1, 2021; (d) a complete indemnification by Marketing Strategies, LLC and the Executive in favor of the Company with respect to any and all potential tax consequences, penalties, damages, or related costs (including defense costs) in the event that any taxing authority (federal, state or otherwise) challenges any aspect of the consulting fees; (e) the provision of no less than 8 hours per month of consulting services to the Company by Marketing Strategies, LLC; and (f) and such other necessary and appropriate provisions as are typically required by the Company in all consulting agreements entered into by the Company.

(e)     For the avoidance of any misunderstanding, the parties affirm that the General Release required of the Executive to receive his Additional Termination Benefits following termination Without Cause or for Good Reason expressly excludes from the release the Executive's rights to the payments and benefits due to the Executive under Sections 6(c) and 6(d) of this Agreement.

## 7. CONFIDENTIALITY; RETURN OF PROPERTY; NON-COMPETITION; NON-SOLICITATION; INTELLECTUAL PROPERTY; NON-DISPARAGEMENT; COOPERATION

(a)     Acknowledgement. As a senior executive officer and director of the Company, the Executive will occupy a position of trust and confidence with respect to the Company's business affairs and the business affairs of the Company's Affiliates, and he will be privy to non-public information generally regarded as confidential and often proprietary with respect to the Company and its Affiliates, including, without limitation, their business relationships, negotiations and past, present and prospective activities, methods of doing business, business plans and financial information, know-how, trade secrets, data, formulas, customer lists, investors, consultants, and advisors, and all papers, resumes and records (including computer records) of the documents containing such information (hereinafter collectively referred to as the "Confidential Information"). Notwithstanding the foregoing, it is agreed that Confidential Information does not include information regarding the Executive's own compensation and benefits or information that became generally available to the public other than as a result of a disclosure by the Executive. The Executive agrees that the following obligations are necessary to preserve the confidential and proprietary nature of Confidential Information and to protect the Company and its Affiliates against harmful competition, harmful solicitation of employees, and other actions by the Executive that would result in serious adverse consequences for the Company and its Affiliates.

(b)     Confidentiality. The Executive shall not, except as may be required to perform his duties hereunder or as required by applicable law, during the Executive's Employment Period and after it ends (regardless of the reason), without limitation in time or until such

US 165358964v4
US 165917597v1

information shall have become public (other than by unauthorized disclosure), disclose to any third party or use for his benefit or the benefit of any third party, whether directly or indirectly, any Confidential Information (as well as any Confidential Information provided by a third party to the Company on a confidential basis). The Executive further agrees to maintain the terms and conditions of this Agreement confidential to the extent practicable by law; provided that the Executive is permitted to disclose the terms of this Agreement to the Executive's family, attorneys, accountants and financial advisers and to the extent necessary to enforce this Agreement.

(c) <u>Return of Property.</u> The Executive acknowledges that all Confidential Information is specialized, unique in nature, and of great value to the Company and its Affiliates, and that such Confidential Information gives the Company and its Affiliates a competitive advantage. The Executive agrees to deliver or return to the Company, at the Company's request at any time or upon termination of his employment for any reason, all Confidential Information and all documents, computer tapes, disks, records, lists, data, drawings, prints, notes and written information (and all copies thereof) furnished by or on behalf of or for the benefit of the Company and its Affiliates or prepared by the Executive during the term of his employment by the Company, whether in tangible or electronic form, but excluding documents relating to the Executive's own compensation and benefits. In the event the Executive determines that Company information may be resident on any of his personal electronic equipment or devices (including telephone, computer, etc.), the Executive shall promptly notify the Company and the Company may use a technician of its choice to review such equipment in the presence of the Executive or his designee to remove any such Company information therefrom.

(d) <u>Non-Competition</u>. During the period commencing on the Effective Date and ending 18 months after the Executive's Date of Termination (regardless of the reason his employment has ended) (such period hereinafter, the "<u>Non-Compete Period</u>"), the Executive shall not, directly or indirectly, have any interest in, or manage or operate any person, firm, corporation, partnership or business (whether as director, officer, employee, agent, representative, partner, security holder, consultant or otherwise), that engages, in a manner and to an extent materially competitive to the Company or its subsidiaries, in the business of providing correctional health care services or pharmacy services (hereinafter referred to as "<u>Competing Activities</u>"). This non-competition restriction shall apply only to those states within the United States in which the Company conducts business or has definitive plans as of the Date of Termination to conduct business (the "<u>Geographic Area</u>"). Notwithstanding the foregoing, the Executive may own, as a passive investor, securities of any entity that engages in Competing Activities and has outstanding publicly traded securities, so long as the Executive's direct holdings in any such entity shall not in the aggregate constitute more than 5% of the voting power of such entity.

(e) <u>Non-Solicitation</u>. During the period commencing on the Effective Date and ending 18 months after the Executive's Date of Termination (regardless of the reason his employment has ended (such period hereinafter, the "<u>Non-Solicit Period</u>")), the Executive shall not, on behalf of himself or any other entity, directly or indirectly:

i.     solicit or encourage any person or entity who was a client or customer of the Company or its subsidiaries during the Executive's employment and with whom Executive had contact or about whom the Executive gained Confidential Information to: (A)

US 165358964v4
US 165917597v1

terminate, reduce, or alter in a manner adverse to the Company or its subsidiaries any existing business arrangements with it, or (B) transfer existing business from the Company or its subsidiaries to any other person or entity;

ii.      solicit any person or entity who was a client or customer of the Company or its subsidiaries during the Executive's employment and with whom the Executive had contact or about whom the Executive gained Confidential Information, for the purpose of providing such person or entity with goods or services competitive with or similar to the goods or services provided by the Company or its subsidiaries;

iii.      induce or attempt to induce any supplier, licensee, licensor, franchisee or other business relation of the Company or its subsidiaries to reduce or cease doing business with the Company or such subsidiary, or in any way intentionally interfere with the relationship between such supplier, licensee, licensor, franchisee or business relation and the Company or its subsidiaries; or

iv.      solicit, entice, persuade, or induce any individual who is employed by the Company or engaged by the Company or its subsidiaries as a consultant or contractor to terminate or refrain from continuing such employment or engagement or to become employed by or provide services to others engaged in Competing Activities.

(f)      <u>Intellectual Property</u>. The Executive shall disclose promptly and in writing to the Company all inventions, creative works and any other intellectual property, whether or not patentable or copyrightable, conceived or created solely or jointly by the Executive during the Employment Period in the course of, related to, or resulting, in whole or in part from the Executive's employment with the Company, and the Executive shall assign all of his interest in them to the Company. The Executive shall execute all papers at the Company's expense, which the Company shall deem necessary to apply for and obtain domestic and foreign patents and copyright registrations, and to protect and enforce the Company's interest in them. These obligations shall continue beyond the period of the Executive's employment with respect to inventions or creations conceived or made by the Executive alone or in conjunction with other employees or consultants of the Company or its Affiliates during the Employment Period.

(g)      <u>Non-Disparagement</u>. During the Executive's Employment Period and after it ends (regardless of the reason), the Executive shall not make to any person or entity any disparaging, defamatory, or derogatory statements or comments about the Company, the Board, its Affiliates, or any of its or their respective directors, officers, employees, products or services. The Company agrees to instruct its directors and executive officers not to disparage, defame, or make derogatory statements about the Executive during and after the Executive's Employment Period, provided, however, that nothing herein shall restrict or prevent the Company's directors or executive officers from exercising their fiduciary obligations.

(h)      <u>Cooperation</u>. During the term of the Executive's employment by the Company and thereafter, at the request of the Company, the Executive will provide reasonable cooperation to the Company or any of its subsidiaries or affiliates with respect to any claims, lawsuits or arbitration by or against the Company or any of its subsidiaries or affiliates, where the

10

Executive has knowledge of any facts involved in such claims, lawsuits or arbitration. The Company shall reimburse the Executive for all expenses reasonably incurred by the Executive during such period in connection with such cooperation with the Company. Any such cooperation shall take into account any responsibilities and commitments to which the Executive is subject, whether to a subsequent employer or otherwise.

(i)     Remedies. In the event of a breach or threatened breach of any of the provisions of this Section 7, the Executive acknowledges that the business interests of the Company will be irreparably injured, the full extent of the damages to the Company will be impossible to ascertain, and monetary damages may not be an adequate remedy. Accordingly, the Executive agrees that in addition to any other remedy that may be available to it, the Company shall be entitled to temporary, preliminary, or permanent injunctive relief or other equitable relief to remedy any such breach or threatened breach (without posting a bond or other security), before any court of competent jurisdiction. In addition, in the event of an alleged breach or violation by the Executive of any of the provisions of this Section 7, the Non-Compete or Non-Solicit Periods, as applicable, shall be tolled until such breach or violation has been duly cured, and the Executive shall have no right to receive, and the Company shall have no obligation to provide, any Severance Payments following the breach or violation.

(j)     Reasonableness of Covenants. The Executive acknowledges that: (i) in the course of his employment with the Company his services will be of special, unique and extraordinary value to the Company and its subsidiaries; (ii) the Company and its subsidiaries are and will be engaged in their business throughout the Geographic Area; (iii) the Executive is one of a limited number of persons who participates in developing the business of the Company and its subsidiaries; (iv) the Executive will occupy a position of trust and confidence with the Company and its subsidiaries and will be familiar with the Company's and its subsidiaries' trade secrets, business plans, and with other proprietary and confidential information concerning the Company, its subsidiaries and their respective businesses; (v) the agreements and covenants contained in this Section 7 are essential to protect the Company and its subsidiaries and the goodwill of their businesses; and (vi) the Executive has means to support himself and his dependents other than be engaging in Competing Activities, and the provisions of this Section 7 will not impair such ability. The Executive acknowledges and agrees that the Company entered into this Agreement in reliance on the provisions of this Section 7 and the enforcement of this Agreement is necessary to ensure the preservation, protection and continuity of the business of the Company and its subsidiaries and other Confidential Information and goodwill of the Company and its subsidiaries to the extent and for the periods of time expressly agreed to herein. The Executive acknowledges that he has carefully read this Agreement and has given careful consideration to the restraints imposed upon him by this Agreement, and is in full accord as to their necessity for the reasonable and proper protection of confidential and proprietary information of the Company and its subsidiaries now existing or to be developed in this future. Accordingly, the Executive expressly acknowledges and agrees that each and every restriction imposed by this Agreement is reasonable with respect to subject matter, time period and geographic scope.

(k)     Survival of Provisions. The obligations contained in this Section 7 shall, to the extent provided in this Section 7, survive the termination or expiration of the Executive's employment with the Company and, as applicable, shall be fully enforceable thereafter in

11

US 165358964v4
US 165917597v1

accordance with the terms of this Agreement. If it is determined by a court of competent jurisdiction in any state that any restriction in this Section 7 is excessive with respect to geographic area, duration, or scope or is otherwise unreasonable or unenforceable under the laws of that state, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the law of that state. In the event that modification is not possible, then the Executive and the Company agree that, because each of the Executive's obligations in this Section 7 is a separate and independent covenant, any unenforceable obligation shall be severed and all remaining obligations shall be enforced.

(l)     <u>Reservation of Rights.</u>  Nothing herein shall prevent the Executive from communicating with or reporting possible violations of federal or state law or regulation to any governmental agency or entity, or making other disclosures that are protected under the whistleblower provisions of federal or state law or regulation.  The Executive does not need the prior authorization of the Company to make any such reports or disclosures and is not required to notify the Company that he has made such reports or disclosures to a governmental agency or entity.  In addition, as set forth in 18 U.S.C. s 1833(b), an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state or local government official, either directly or indirectly, or to an attorney, and is made solely for the purpose of reporting or investigating a suspected violation of law, or that is made in a complaint or other document filed in a lawsuit or other proceeding if such filing is made under seal.

(m)     During the Non-Compete and Non-Solicit Periods, the Executive promises and agrees to provide a copy of Section 7, only, of this Agreement to any person or entity from whom the Executive seeks a job or work, and authorizes the Company to provide a copy of Section 7, only, of this Agreement to any such person or entity and discuss the provisions and ramifications of this Agreement with said person or entity

## 8.     NO VIOLATION OF THIRD-PARTY RIGHTS.

(a)     The Executive hereby represents, warrants and covenants to the Company that the Executive:

      i.     shall not, during the Employment Period, infringe upon or violate any proprietary rights of any third party (including, without limitation, any third party confidential relationships, patents, copyrights, trade secrets or other proprietary rights);

      ii.     is not a party to any agreements with third parties that prevent him from fulfilling the terms of employment and the obligations of this Agreement or which would be breached as a result of his execution of this Agreement; and

      iii.     agrees to respect any and all valid obligations which he may now have to prior employers or to others relating to confidential information, inventions or discoveries which are the property of those prior employers or others, as the case may he.

US 165358964v4
US 165917597v1

(b)     If the Executive is in breach of any of the foregoing representations, warranties and covenants and a court of competent jurisdiction or other adjudicator issues a final order (not including a temporary restraining order or other order subject to interlocutory appeal) precluding the Executive from performing his duties hereunder, the Company shall be entitled to terminate this Agreement and treat the Executive as if he were terminated for Cause.

9.     **WITHHOLDING**.  The Company shall make such deductions and withhold such amounts from each payment made to the Executive hereunder as may be required from time to time by law, governmental regulation or order.

10.     **SECTION 409A**.  The Executive and the Company acknowledge that each of the payments and benefits promised to the Executive under this Agreement are intended to either comply with the requirements of Code Section 409A and the regulations thereunder or qualify for an exception from compliance, and this Agreement shall be construed and administered accordingly.  With respect to payments under this Agreement, for purposes of Code Section 409A, each severance payment will be considered one of a series of separate payments.  The Executive and the Company further agree that, to the extent not otherwise exempt, the termination benefits described in this agreement are intended to be exempt from Code Section 409A pursuant to Treasury Regulation Section 1.409A-1(b)(4) as short-term deferrals or as payments pursuant to a separation pay plan pursuant to Treasury Regulation Section 1.409A-1(b)(9)(iii).  In the case of a payment that is not excepted from compliance with Code Section 409A and that is not otherwise designated to be paid immediately upon a permissible payment event within the meaning of Treasury Regulation Section 1.409A-3(a), the payment shall not be made prior to, and shall, if necessary, be deferred to and paid on the later of the date 60 days after the Executive's earliest separation from service (within the meaning of Treasury Regulation Section 1.409A-1(h)) and, if the Executive is a specified employee (within the meaning of Treasury Regulation Section 1.409A-1(i)) on the date of his separation from service, the first day of the seventh month following the Executive's separation from service. Reimbursement of any expenses provided for in this Agreement shall be made in accordance with the terms of this Agreement (but in no event later than the end of calendar year following the year such expenses were incurred) and in no event shall (a) the amount of expenses eligible for reimbursement hereunder during a taxable year affect the expenses eligible for reimbursement in any other taxable year or (b) the right to reimbursement be subject to liquidation or exchange for another benefit.  In no event shall the Company be liable for any additional taxes, interest or penalties that may be imposed on the Executive pursuant to Section 409A of the Code.

11.     **NOTICES**.  All notices and other communications under this Agreement shall be in writing and shall be given by hand overnight or first-class mail, certified or registered with return receipt requested, or by email with acknowledgment of receipt, and shall be deemed to have been duly given upon delivery or three days after mailing to the respective persons named below:

If to the Company:

Corizon Health
103 Powell Court
Brentwood, TN  37027
Attention:  Chair of the Board

13

US 165358964v4
US 165917597v1

with a copy to:

Corizon Health
103 Powell Court
Brentwood, TN 37027
Attention: General Counsel

If to the Executive, at the address for the Executive then on file with the Company. Any notice or communication to Executive under this Agreement shall also be sent simultaneously to his email address at that time known to the Company, with a copy emailed simultaneously to his legal counsel at Sklover@ExecutiveLaw.com.

Either party may change such party's address for notices by notice duly given pursuant hereto.

**12.    DISPUTE RESOLUTION; ATTORNEYS' FEES**. The Company and the Executive agree that any dispute arising as to the parties' rights and obligations hereunder, other than with respect to injunctive or equitable relief under Section 7 hereof, shall be resolved by binding confidential arbitration in Nashville, Tennessee, before a single arbitrator and in accordance with the rules of the American Arbitration Association for resolution of employment disputes then in effect.  Each party shall have the right, in addition to any other relief granted by such arbitrator (or by any court of competent jurisdiction with respect to injunctive or equitable relief granted with respect to Section 7 hereof), to reasonable attorneys' fees based on a determination by the arbitrator (or, with respect to Section 7 hereof, the court) of the extent to which each party has prevailed as to the material issues raised by the dispute. Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

**13.    GOVERNING LAW**. This Agreement and the legal relations thus created between the parties hereto shall be governed by and construed under and in accordance with the laws of the State of Tennessee, without regard to its conflicts of law principles.

**14.    ENTIRE AGREEMENT; TERMINATION OF PRIOR AGREEMENTS**. This Agreement, contains the entire understanding of the parties relating to the employment of the Executive. This Agreement terminates and supersedes and any and all prior agreements and understandings between the parties with respect to the Executive's employment and compensation by the Company, whether or oral or written, other than those described herein.  This Agreement does not, however, terminate or supersede any of the provisions of, or the whole of, the Restricted Stock Award Agreement executed prior or simultaneous to the execution of this Agreement.

**15.    WAIVER; MODIFICATION**. Failure to insist upon strict compliance with any of the terms, covenants or conditions hereof shall not be deemed a waiver of such term, covenant or condition, nor shall any waiver or relinquishment of, or failure to insist upon strict compliance with, any right or power hereunder at any one or more times be deemed a waiver or relinquishment of such right or power at any other time or times. This Agreement shall not be modified in any respect except by a writing executed by each party hereto.

14

16. **ASSIGNMENT; SUCCESSORS**. This Agreement is personal in its nature and the Executive shall not assign or transfer this Agreement or any rights or obligations hereunder. The Company may assign its rights and obligations under this Agreement to any entity, including any successor to all or substantially all the assets of the Company, by merger or otherwise. This Agreement shall be binding upon and inure to the benefit of the Company, the Executive and their respective successors, assigns, personnel and legal representatives, executors, administrators, heirs, distributes, devisees, and legatees, as applicable.

17. **SEVERABILITY**. Except as provided in Section 7(j) hereof, in the event that a court of competent jurisdiction or other adjudicator determines that any portion of this Agreement is in violation of any statute or public policy or otherwise unlawful or unenforceable, only the portions of this Agreement that violate such statute or public policy or are otherwise unlawful or unenforceable shall be stricken. All portions of this Agreement that do not violate any statute, public policy, or other law shall continue in full force and effect. Furthermore, any order striking any portion of this Agreement shall modify the stricken terms as little as possible to give as much effect as possible to the intentions of the parties under this Agreement.

18. **SURVIVAL OF PROVISIONS**. Upon any termination of the Executive's employment, the provisions of Sections 6 through 21 of this Agreement (together with any related definitions) shall survive to the extent necessary to give effect to the provisions thereof, and shall be enforceable thereafter in accordance with the terms thereof.

19. **HEADINGS; INCONSISTENCY**. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. In the event of any inconsistency between the terms of this Agreement and any form, award, plan or policy of the Company, the terms of this Agreement shall control.

20. **COUNTERPARTS AND FACSIMILE SIGNATURE**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. In the event that any signature is delivered via facsimile or e-mail transmission, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or digital signature page were an original signature.

21. **REPRESENTATION BY COUNSEL; INTERPRETATION**. Each party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement. Any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the party that drafted it has no application and is expressly waived.

[Signature Pages Follow]

US 165358964v4
US 165917597v1

IN WITNESS WHEREOF, the Company has caused this Agreement to be executed by its duly authorized officer and the Executive has hereunto signed this Agreement on the dates written below.


VALITAS HEALTH SERVICES, INC.


_____          _____
By: Jeff Goldberg                                                  Date
Title: Chair of the Board


EXECUTIVE


_____          _____
James E. Hyman                                                    Date

US 165358964v4
US 165917597v1

**APPENDIX 1**

**Approved Corporate, Civic and Charitable Boards**

1. Jason Industries, Inc.
2. Camin Cargo Control, Inc.
3. The Hinkley Company, Inc.
4. The MegaCities Project

US 165358964v4
US 165917597v1

# APPENDIX 2

## General Release

I, James E. Hyman, in consideration of the performance by Valitas Health Services, Inc., a Delaware corporation (the "Company"), of its obligations under the Employment Agreement dated as of September 3, 2019 (as amended from time to time, the "Agreement"), do hereby release and forever discharge as of the date hereof the Company, its present and former parents, subsidiaries, and affiliated entities, and each of their respective present and former members, managers, directors, officers, shareholders, agents, representatives, employees, successors and assigns (collectively, the "Released Parties") to the extent provided herein (this "General Release").

1.      I understand that receipt of the Additional Termination Benefits (as defined in the Agreement), represents, in part, consideration for signing this General Release and that the Additional Termination Benefits are not salary, wages or benefits to which I was already entitled without the execution and delivery of this General Release. I understand and agree that I will not receive any Additional Termination Benefits unless I execute this General Release and do not revoke this General Release within the time period permitted hereafter, and do not breach this General Release. Payment of the Additional Termination Benefits will not be considered compensation for purposes of any employee benefit plan, program, policy or arrangement maintained or hereafter established by the Company. I also acknowledge and represent that I have received all other payments and benefits that I am entitled to receive (as of the date hereof) by virtue of any employment by the Company, other than the Accrued Benefits and the Additional Termination Benefits (as defined in the Agreement).

2.      Except as provided in **paragraph 3 below**, I knowingly and voluntarily (for myself, my heirs, executors, attorneys, representatives, agents, administrators and assigns) fully and unconditionally release and forever discharge the Company and the other Released Parties from any and all claims, suits, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, both past and present (through the date this General Release becomes effective and enforceable) and whether known or unknown, suspected, or claimed against the Company or any of the Released Parties which I, or any of my heirs, executors, attorneys, representatives, agents, administrators or assigns, may have, which arise out of or are connected with my employment with, or the separation or termination of my employment from, the Company and its affiliates (including, but not limited to, any allegation, claim or violation, arising under: Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967 (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or any state or local wage and hour law; or under any public policy, contract or tort, or under common law; or arising under any employment policies, practices or

18

US 165358964v4
US 165917597v1

procedures of the Company or any of its affiliates; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, defamation; or any claim for costs, fees, or other expenses, including attorneys' fees incurred in these matters) (all of the foregoing collectively referred to herein as the "Claims"). I understand and intend that, except as provided in Paragraph 3 below, this General Release constitutes a general release of all claims and that except as provided herein no reference herein to a specific form of claim, statute or type of relief is intended to limit the scope of this General Release.

3. Notwithstanding the foregoing or anything else in this General Release, and for the avoidance of doubt, I am not waiving and am not being required to waive (i) any right that cannot be waived under law, (ii) rights or claims that I may have which arise after the date I execute this General Release, (iii) the right to enforce this General Release, the Agreement, or the Restricted Stock Award Agreement; (iv) any rights I may have under the Company's Stockholders Agreement and the Company's by-laws; (v) any indemnification rights under the Company's by-laws, its directors and officers liability insurance, or any indemnification agreement entered into with the Company; (vi) any rights to vested employee benefits, or to Accrued Benefits or Additional Termination Benefits (each as defined in and in accordance with the Employment Agreement); and (vii) the right to file an administrative charge with, communicate with or report possible violations of federal or state law or regulation to any governmental agency or entity (including, but not limited to the Equal Employment Opportunity Commission), or make other disclosures to governmental agencies or entities that are protected under the whistleblower provisions of federal or state law or regulation, with or without notice to the Company; provided, however, that I disclaim and waive any right to share or participate in any monetary award resulting from the prosecution of such charge or investigation or proceeding, to the maximum extent permitted by law (hereafter, the "Surviving Claims" which survive this release).

4. In signing this General Release, I acknowledge and intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned or implied, but not the Surviving Claims. I expressly consent that this General Release shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected Claims (notwithstanding any state statute that expressly limits the effectiveness of a general release of unknown, unsuspected or unanticipated Claims), if any, as well as those relating to any other Claims hereinabove mentioned or implied, but not the Surviving Claims. I acknowledge and agree that this waiver is an essential and material term of this General Release and that without such waiver the Company would not have agreed to the terms of the Agreement.

5. I agree that neither this General Release, nor the furnishing of the consideration for this General Release, shall be deemed or construed at any time to be an admission by the Company, any Released Party or myself of any improper or unlawful conduct.

6. I agree that if I violate this General Release by suing the Company or any of the other Released Parties (other than, for the avoidance of doubt, for claims I have not released, including pursuant to paragraph 3 of this General Release, that is, the Surviving Claims), this General Release shall serve as a complete defense to such Claims to the maximum extent permitted by law, and I further agree that I will pay to the Released Parties all costs and expenses

19

of defending against the suit incurred by the Released Parties, including reasonable attorneys' fees, and also agree to return all payments received by me pursuant to the Agreement.

7.      I agree that this General Release and the Agreement are confidential and agree not to disclose any information regarding the terms of this General Release or the Agreement, except to my spouse, attorney, financial advisor, tax advisor, or as otherwise required by law or the Agreement or to enforce the Agreement and this General Release, and provided that he, she or they agree to keep this General Release and the Agreement strictly confidential.  In addition, any non-disclosure provision in this General Release does not prohibit or restrict me (or my attorney) from communicating with or responding to any inquiry about this General Release or its underlying facts and circumstances by the Securities and Exchange Commission (SEC) or any other self-regulatory organization or governmental entity.

10.      Whenever possible, each provision of this General Release shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this General Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this General Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein. Upon a finding by a court of competent jurisdiction that any release or agreement in this General Release is illegal, void or unenforceable, I agree, to execute promptly a release and agreement that is legal and enforceable. My failure to comply with the foregoing obligations will constitute a material breach of this General Release. This General Release shall inure to the benefit of the Released Parties, each of whom shall be a third party beneficiary of this General Release.

11.      This General Release shall be governed by and construed under and in accordance with the laws of the State of Tennessee, without regard to its conflicts of law principles.

BY SIGNING THIS GENERAL RELEASE, I REPRESENT AND AGREE THAT:

(i)      I HAVE READ IT CAREFULLY;

(ii)      I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE EQUAL PAY ACT OF 1963, THE AMERICANS WITH DISABILITIES ACT OF 1990, AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, ALL AS AMENDED;

(iii)      I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

(iv)      I AM HEREBY ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND I HAVE DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION I HAVE CHOSEN NOT TO DO SO OF MY OWN VOLITION;

(v)      I HAVE HAD AT LEAST 21 DAYS FROM THE DATE OF MY RECEIPT OF THIS RELEASE TO CONSIDER IT AND THE CHANGES MADE SINCE THEN ARE NOT MATERIAL AND WILL NOT RESTART THE REQUIRED 21 DAY PERIOD;

20

(vi)    I UNDERSTAND THAT I HAVE SEVEN DAYS AFTER THE EXECUTION OF THIS RELEASE TO REVOKE IT AND THAT THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

(vii)    I HAVE SIGNED THIS GENERAL RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

(viii)    I AGREE THAT THE PROVISIONS OF THIS GENERAL RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.

DATED AS OF _____, 20___

_____
James E. Hyman

US 165358964v4
US 165917597v1