# SECOND AMENDMENT TO EXECUTIVE EMPLOYMENT AGREEMENT

THIS SECOND AMENDMENT TO EXECUTIVE EMPLOYMENT AGREEMENT (this "Second Amendment") is entered into by and between Valitas Health Services, Inc. (the "Company") and James E. Hyman ("Executive"), effective as of September 3, 2020 ("Second Amendment Effective Date"). The Company and Executive are each sometimes referred to herein individually as a "Party" or collectively as the "Parties".

## PRELIMINARY STATEMENT

A. The Company and Executive are parties to that certain Executive Employment Agreement dated and effective as of September 3, 2019 (the "Base Agreement"). The Base Agreement (as amended) is in full force and effect as of the Second Amendment Effective Date. Capitalized terms used in this Second Amendment without otherwise being defined herein shall have the meanings given to them in the Base Agreement.

B. Pursuant to the Base Agreement and subject to the terms and conditions set forth therein, Executive was employed as the Company's CEO. Upon the Parties' execution and delivery of this Second Amendment, Executive continues to serve as the Company's CEO as of the Second Amendment Effective Date, pursuant to the Base Agreement, as amended by the First Amendment, the Further Amendment and the Second Further Amendment (each as defined below).

C. On or about June 26, 2020, the Company became subject to a Change in Control (the definition of which Change in Control was incorporated by reference into the Base Agreement from the Company's Long Term Incentive Plan). The Change in Control referenced in the preceding sentence is sometimes referred to herein as the "Sale Transaction".

D. By letter dated August 14, 2020 (the "Change in Control Notice"), Executive provided the Company with a Notice of Existence of Good Reason in accordance with the provisions of Section 6 (a) (iii) (D) of the Base Agreement, citing the Sale Transaction as Good Reason, giving Executive the right to terminate his employment as CEO in accordance with the applicable provisions of the Base Agreement.

E. The Base Agreement provides Executive a period of 30 calendar days after expiration of the Company's "Good Reason" cure period (as established in the Base Agreement) in which to provide a written notice of resignation, which 30-day period was set to expire on September 27, 2020. Effective as of September 18, 2020, October 8, 2020 and October 19, 2020, the Parties entered into a series of Amendments to the Executive Employment Agreement ("First Amendment", "Further Amendment" and "Second Further Amendment") by which (i) the Company acknowledged the adequacy and timeliness of the Executive's Change in Control Notice (which Executive had entitled "Notice of Existence of Good Reason," and transmitted to the Company) and (ii) the Parties increased the time period for Executive to provide a written notice of resignation from 30 days to 62 days after expiration of the Cure Period, which 62 day period now expires on October 29, 2020.

10026473-12

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and Executive, each intending to be legally bound, hereby covenant and agree as follows:

1. Introduction. This Second Amendment supplements and amends the Base Agreement as previously amended by the First Amendment, the Further Amendment and the Second Further Amendment. Effective from and after the Second Amendment Effective Date, references to the "Agreement" shall mean the Base Agreement, as amended by the First Amendment, the Further Amendment, the Second Further Amendment, and by this Second Amendment.

2. Continuing Employment. Section 1 of the Base Agreement (entitled "Employment") continues in full force and effect, without amendment, modification, alteration, deletion, supplementation or clarification except for the addition of the following:

(a) Executive continues in his service and role as CEO and as a member of the Board. Executive acknowledges and confirms that the composition of the Board changed in connection with the Sale Transaction, and that the current Board comprises four members, including Executive, operating under a newly adopted management and supervisory structure featuring a chairperson and a "Lead Director", each as identified in Board resolutions adopted and in effect from time to time.

(b) Executive shall at all times be authorized to delegate primary responsibility for various aspects of Company operations to members of his management team or others, as he, in his discretion, may deem appropriate. Executive will nevertheless retain his ultimate responsibility for the proper discharge of his duties as CEO.

3. Term of Agreement. Section 2 of the Base Agreement (entitled "Term of Agreement") continues in full force and effect (including its reference to, and incorporation of, the provisions of Section 6 of the Base Agreement.

4. Location. The last three sentences of Section 3 of the Base Agreement (entitled "Location") are deleted. The Company shall not have a right to request the Executive to relocate Executive's principal place of employment. Executive will continue to be based out of his home office in Stamford, Connecticut, with the understanding and agreement that the Company's business and Executive's responsibilities require regular travel to the Company's corporate office in Brentwood, Tennessee and other locations as Company business or specific Board direction requires. Executive shall continue to be entitled to travel expense reimbursement in accordance with Section 5(c) of the Base Agreement.

5. Compensation; Base Salary and Incentive Bonus.

(a) Section 4 (a) of the Base Agreement (entitled "Base Salary") continues in full force and effect without amendment, modification, alteration, deletion, supplementation or clarification, except that: (i) on lines 1, 4 and 9, the phrase "Effective Date" is replaced by "Second Amendment Effective Date", (ii) on line 2, the number "$850,000" is increased to $875,500 effective from and after the Second Amendment Effective Date, and (iii) the reference to a 3% increase in the Base Salary on the first and second anniversary of the Effective Date is amended to

2

provide that the Base Salary as in effect on the Second Amendment Effective Date shall increase by 3% (over the prior years' Base Salary) on the first and second anniversary dates of the Second Amendment Effective Date.

(b) Section 4 (b) of the Base Agreement (entitled "Incentive Bonus") continues in full force and effect without amendment, modification, alteration, deletion, supplementation or clarification. The Parties agree that should Executive be employed by the Company until December 31, 2020, he shall be entitled to a full-year Incentive Bonus for calendar year 2020.

6. <u>Compensation; Restricted Stock Award</u>.

(a) Section 4 (c) of the Base Agreement (entitled "Restricted Stock Award Agreement") provided that Executive would be entitled to an award of restricted stock pursuant to a certain Restricted Stock Award Agreement in the form attached as Exhibit A to the Base Agreement (the "<u>Prior Stock Award Agreement</u>"). Executive acknowledges and confirms that he had and has no vested entitlement under the Prior Stock Award Agreement, which the Parties acknowledge is a nullity, and that Executive owns and holds no capital stock, other securities, option or other rights involving ownership interests of any class in the Company as of the Second Amendment Effective Date, except for the Equity Incentive Plan as described below.

(b) Section 4 (c) of the Base Agreement is amended to provide that (i) upon Executive's completion, execution and delivery of the Shareholders Agreement and Award Agreement, attached hereto as <u>Exhibit A</u>, Executive will be vested in the Valitas Health Services, Inc. 2020 Equity Incentive Plan (the "<u>Equity Incentive Plan</u>") (the Shareholders Agreement and Award Agreement being as defined in the Equity Incentive Plan), and (ii) all references to the Restricted Stock Award Agreement in the form attached as Exhibit A to the Base Agreement are deleted.

(c) As provided in Section 10.1 of the Equity Incentive Plan, Executive shall be entitled to participate in a contemplated and conditional *pro rata* distribution or dividend based on the Company's indirect ownership of PharmaCorr, LLC, and/or Corizon LLC, and/or Endeavor Distribution LLC (collectively, the "<u>PharmaCorr Group</u>"), if, as and when the Company consummates a contemplated spin-off or other disposition of an entity or entities comprising the PharmaCorr Group ("<u>PharmaCorr Disposition</u>"). The distribution or dividend that results from a PharmaCorr Disposition is described in Section 10.1 of the Valitas Stock Award Agreement. Executive's rights and entitlements in respect of such distributions or dividends are subject to the same vesting requirements and limitations on receipt of dividends as are set forth with respect to Company restricted stock in the Equity Incentive Plan. In addition, such rights and entitlements shall be subject to option call rights inuring to investors in the PharmaCorr Group, as provided in Section 10.1 of the Equity Incentive Plan.

7. <u>Compensation; Transaction Bonus</u>. Section 4 (d) of the Base Agreement (entitled "Transaction Bonus") is deleted in its entirety, and the following is inserted in its stead:

(a) Without any effect whatsoever upon Executive's rights, entitlements and interests under Section 12 hereof (entitled "Sale Transaction Settlement Compensation"), in the event that a Change in Control shall occur subsequent to the Second Amendment Effective Date, Executive (or his designated nominee(s)) shall receive from the Company, as provided in subsection

(e) below, that amount of money, if any, by which (a) $2.0 million dollars exceeds (b) the sum derived by adding the following monies received by Executive between the Second Amendment Effective Date and the consummation of the Change in Control (collectively, "Equity-Derived Proceeds"): (i) cash dividends or distributions paid to Executive (or his nominee) in respect of vested securities holdings issued to Executive or his nominee pursuant to the Equity Incentive Plan, plus (ii) monies received by Executive or his nominee due to a PharmaCorr Disposition, including the dollar amount of any related escrow distribution or earn-out from a PharmaCorr Disposition, plus (iii) monies received by Executive or his nominees in connection with the Change of Control transaction itself. The amount by which $2 million is greater than the aggregate dollar amount of the Equity-Derived Proceeds received by Executive or his nominee is referred to as the "Transaction Bonus".

(b) Notwithstanding the itemization of monies comprising the Equity-Derived Proceeds as described in subsection (a) above, and notwithstanding anything else herein to the contrary, the Equity-Derived Proceeds shall not include monies paid to Executive or his nominee as or for any other purposes, including without limitation, (i) Base Salary, (ii) Incentive Bonus(es), (iii) monies received in reduction of or final payment of the Sales Transaction Settlement Amount, including (without limitation), any amount that may be payable, if any, under the tax gross-up provisions set forth in Section 12 (b) below and pursuant to the Tax Gross Up Note, (iv) fringe benefits, and (v) reimbursements of expenses including but not limited to legal fees and related expenses.

(c) Notwithstanding the foregoing or anything else to the contrary in the Agreement or the Equity Incentive Plan, a PharmaCorr Disposition (if applicable) shall not constitute a Change in Control for purposes of Section 4 (d) of the Base Agreement (as amended hereby) or for any other purpose under the Agreement.

(d) The Parties acknowledge that, pursuant to the Equity Incentive Plan, the Company is vested with a "call" option if Executive exits the Company for Good Reason or is terminated by the Company without Cause prior to a Change of Control. If exercised by the Company pursuant to the Equity Incentive Plan within 20 calendar days after a Change of Control or other resignation for Good Reason, or Executive's termination without Cause, the "call" option affords the Company the vested and irrevocable right to repurchase all Company equity owned by Executive based on a per share price (the "Option Price") determined by valuing the Company on a stipulated valuation basis corresponding to five times trailing 12 month adjusted EBITDA, calculated in accordance with the Company's regular accounting practices consistently applied ("Stipulated FMV"), multiplied by Executive's and/or his nominees' total percentage ownership interest in the Company. If the Company's "call" option is exercised, and if the total Option Price paid to Executive plus the aggregate of Equity-Derived Proceeds paid to Executive or his nominees prior to the Change of Control is less than $2 million, then, Executive will be entitled to the Transaction Bonus determined to be due after payment of the Option Price.

(e) If a Transaction Bonus becomes due and payable, the amount determined to be due to Executive thereunder shall be paid by the Company in the form of a remittance, subject to applicable taxes and withholdings (and not made subject to a promissory note), within 30 calendar days from the date of the Change in Control.

(f) Executive is hereby granted and irrevocably vested with a "put" option, exercisable in Executive's discretion if Executive exits the Company for Good Reason or is

4

terminated by the Company without Cause prior to a Change of Control, and if the Company does not exercise its "call" option pursuant to the Equity Incentive Plan within 20 calendar days after a Change of Control or other events activating the "call" option as specified in the Equity Incentive Plan. In any such event, Executive will have a further 20 calendar days after expiration of the "call" option (a total of 40 calendar days after a Change of Control or other activating event) within which to exercise his "put" option by written notice to the Company. If Executive exercises his "put" option, the Company agrees to purchase all Company equity owned by Executive or his nominees for the Option Price (i.e., Executive's and/or his nominees' total percentage ownership interest in the Company as of the Change of Control multiplied by Stipulated FMV). If Executive's "put" option is exercised, and if the total Option Price paid to Executive, plus the aggregate of Equity-Derived Proceeds paid to Executive or his nominees, is less than $2 million, then, Executive will be not entitled to any Transaction Bonus.

(g) If Executive does not exit the Company for Good Reason following a Change of Control, and if the Company does not exercise its "call option" under the circumstances specified in the Equity Incentive Plan, and if Executive does not exercise his "put" option thereafter, then, Executive will not be entitled to a Transaction Bonus (if it would otherwise have become due and payable), and Executive (or his designated nominees) will retain the restricted stock awarded pursuant to the Equity Incentive Plan and/or acquired in connection with a PharmaCorr Disposition, and Executive or his designated nominees will be entitled to the dividends and other benefits inuring to such vested stock interests on an ongoing basis, including without limitation, in connection with a subsequent Change of Control.

8. <u>Fringe Benefits</u>. Section 5 of the Base Agreement (entitled "Fringe Benefits") continues in full force and effect without amendment, modification, alteration, deletion, supplementation or clarification.

9. <u>Amendments to Good Reason Termination Provisions</u>. Section 6(a) (iii) of the Base Agreement is amended to change the predicates for Good Reason as follows:

(a) Good Reason will arise under Section 6 (a) (iii) if a reduction in Executive's base salary occurs as provided in Section 6 (a) (iii) (A), or if a material reduction in Executive's authority, duties or reporting relationship with the Board occurs as provided in Section 6 (a) (iii) (B), unless agreed to by the Executive; *provided, however,* that this provision shall not apply, and Good Reason will not be deemed to exist (i) if there takes place a reduction in Executive's title, duties or responsibilities solely with regard to PharmaCorr operations following a PharmaCorr Disposition; and/or (ii) if the Board (or its Chair or Lead Director on its behalf) directs Executive to refrain from acting within the scope of his duties, authorities and responsibilities on one or more distinct occasions regarding one or more distinct aspects of his duties or responsibilities; and/or (iii) if the Board (or the Chair or Lead Director appointed by the Board), in the lawful exercise of the Board's discretion, requires Executive to perform duties and responsibilities as are customarily performed by persons holding the position of chief executive officer of operating companies and that are otherwise reasonably consistent with the scope and nature of Executive's duties and responsibilities as set forth in the Agreement. Good Reason will be deemed to exist if Executive is directed by the Board (or its Chair or Lead Director on its behalf) to (x) refrain from addressing one or more of his duties, authorities and responsibilities on a regular, ongoing, and/or continuing basis, (y) refrain from addressing one or more categories of duties and responsibilities on a regular, ongoing and/or continuing basis, and/or (z) person(s) other than Executive are directed by the Board (or its Chair or

Lead Director on its behalf) to assume part or all of Executive's CEO duties, authorities or responsibilities on an ongoing and/or other continuing basis.

(b) Good Reason will arise under Section 6 (a) (iii) (D) if a Change in Control occurs after the Second Amendment Effective Date; *provided however*, that a PharmaCorr Disposition shall not constitute a Change in Control for purposes of Section 6 (a) (iii) or for any other purpose under the Agreement, and Good Reason shall not arise solely on account thereof.

(c) A new subsection (F) is added to Section 6 (a) (iii) of the Agreement, which, as so added, shall provide that Good Reason will arise under Section 6 (a) (iii) (F) in the event of a transfer of equity ownership (or similar event affecting such equity ownership) in M-2 HoldCo LLC, the indirect holder of controlling equity interests in the Company, if such transfer (or similar event0 results in Michael Flacks and/or Michel Rybkin no longer being in ultimate control over the management decisions of M-2 HoldCo LLC or of the Company.

(d) A new subsection (G) is added to Section 6 (a) (iii) of the Agreement, which, as so added, shall provide that Good Reason will arise under Section 6 (a) (iii) (G) if diminution in value of Executive's equity interests in the Company (including without limitation PharmaCorr) occurs as a direct or indirect result of a corporate transaction by the Company, one or more of its affiliates or beneficial holders of interests, including without limitation M-2 Holdco, LLC or M-2 Equity Co, LLC, or otherwise, without full and simultaneous payment to him of a sum equal to the value of such diminution resulting from such corporate transaction.

(e) Notwithstanding the foregoing provisions, Good Reason shall exist only if (x) the Company is provided written notice of the specific circumstances alleged to constitute Good Reason within 60 days of Executive's knowledge of the initial existence of the circumstances, and (y) the Executive resigns within 30 days following the end of the Cure Period. Any resignation that does not meet all of the foregoing requirements shall not be deemed for Good Reason.

(f) Section 6 (a) (iii) of the Agreement remains in full force and effect, without amendment, limitation or supplementation, except as set forth in this Section 9 above.

10. <u>Accrued and Unpaid Benefits Upon Termination</u>. Section 6 (c) of the Base Agreement is amended to add a new Subsection 6 (c) (vi) to provide that the Accrued Benefits as defined therein shall include any unpaid Sale Transaction Settlement Amount and (if applicable) any Tax Gross-Up Amount (as each such term is defined in this Second Amendment).

11. <u>Amendments - Additional Termination Benefits</u>.

(a) Section 6 (d) (v) of the Base Agreement is amended to provide that if Executive's employment is terminated by the Company without Cause or by Executive for Good Reason (x) in or after the 12th month but less than the 18th month following the Second Amendment Effective Date, then the Severance Period shall be 18 months and the duration of the Severance Payment shall be 18 months from termination, or (y) after 18 months from the Second Amendment Effective Date, then the Severance Period shall be increased to 24 months and the duration of the Severance Payment shall be 24 months from termination.

6

(b) Section 6 (d) (vi) of the Base Agreement is amended and restated in its entirety, and as amended and restated, Section 6 (d) (vi) of the Base Agreement shall read in full as follows:

"The Company and Executive's consulting firm, Marketing Strategies, LLC ("Marketing Consultant"), shall enter into the consulting agreement attached as Exhibit B without modification of any kind other than (i) insertion of the Effective Date (which shall be no later than 30 days after Executive's Date of Termination), and (ii) execution by (A) Marketing Consultant, (B) the Company, and (iii) Executive as to Section 8, only."

(c) For sake of clarity and avoidance of doubt, the General Release and other covenants and contingencies bearing on Severance Payments as set forth in Section 6 (d) (i) of the Agreement are unchanged and in full force and effect, except that (i) the Company's payment of the Sale Transaction Settlement Amount and the Tax Gross Up Amount (if applicable) shall be added to the Surviving Claims described and/or listed in Section 3 of the Release, (ii) references to the Agreement in the Release shall refer to the Base Agreement, as amended by the First Amendment, the Further Amendment, the Second Further Amendment and this Second Amendment, and (iii) "Delaware" shall be substituted for "Tennessee" in Section 11 of the Release.

(d) Executive's right to be paid the Sale Transaction Settlement Amount and the Tax Gross Up Amount (if it becomes due) shall be deemed added to Section 6 (e) of the Base Agreement as exclusions to the General Release.

12. Sale Transaction Settlement Compensation.

(a) The Parties have agreed that Executive has earned for his services to the Company prior to the Second Amendment Effective Date, and at Executive's direction (hereby confirmed by Executive), the Company will pay Executive's affiliated nominee, Jeken Partners 2, LLC ("Jeken Partners 2"), on Executive's behalf, the sum of $1,949,000 (the "Sale Transaction Settlement Amount"). The Sale Transaction Settlement Amount is payable in twelve equal monthly installments of $162,416.67 per month, except that the Company will pay the first two monthly installments of the Sale Transaction Settlement Amount (totalling $324,833.34) within two business days following execution and delivery of this Second Amendment, and the third monthly installment on or before November 15, 2020, and the fourth monthly installment on or before December 15, 2020. Thereafter, the eight successive monthly installments of the Sale Transaction Settlement Amount remaining due will be paid on or before the fifteenth day of each month beginning January 15, 2021 through and including July 15, 2021, with the final monthly installment being due on or before August 15, 2021.

(b) The Sale Transaction Settlement Amount represents the Parties' agreement on the net amount payable to Executive on an after-tax basis. The Sale Transaction Settlement Amount was determined by taking into account the 2020 highest marginal federal and Connecticut state income tax rates, which rates for calendar year 2020 are 37% for federal income tax, and 6.99% for Connecticut income tax, or 43.99% combined. If for calendar year 2021, the highest marginal federal or Connecticut state income tax rates increase over the 2020 highest marginal federal rate (37%) or the 2020 highest marginal state rate (presently 6.99%), as applicable, then, the Sale Transaction Settlement Amount payments payable in 2021 shall be grossed-up by the amount (the "Tax Gross-Up Amount") necessary to result in Executive receiving the same amount in 2021 on an after-tax

basis as Executive would have received if the combined federal and/or Connecticut highest marginal income tax rates in 2021 were not greater than 43.99% combined.

    (c) The Sale Transaction Settlement Amount will be evidenced by a unconditional promissory note executed and delivered by the Company (outside of Florida) to Jeken Partners 2, attached hereto as Exhibit C (the "Settlement Amount Note"). Executive acknowledges that he directed the Company to issue the Settlement Amount Note and pay the Sale Transaction Settlement Amount directly to Jeken Partners 2, and that the Company's timely performance in paying the Sale Transaction Settlement Amount to Jeken Partners 2 will satisfy the Company's obligations to Executive in connection with the Sale Transaction Settlement Amount.

    (d) The conditional obligation of the Company to Executive for payment of the Tax Gross-Up Amount (if it becomes due) shall be memorialized and evidenced by a separate conditional promissory note executed and delivered by the Company (outside of Florida) attached hereto as Exhibit D (the "Tax Gross-Up Note").

    (e) The Sale Transaction Settlement Amount (payable to Jeken Partners 2) and Settlement Amount Note (issued to Jeken Partners 2) are accepted by Executive in lieu of any or all Severance Payments and/or Additional Termination Benefits that would have been paid under the Base Agreement but for this Second Amendment. For clarification, under no circumstance shall payments to Jeken Partners 2 under the Settlement Amount Note be delayed for any reason pertaining to the Tax Gross Up Note.

    (f) The Settlement Amount Note and the Tax Gross-Up Note will each be guaranteed by M2 LoanCo, LLC, a Florida limited liability company (the "Guarantor") pursuant to guaranty agreements attached hereto as Exhibit E-1 and Exhibit E-2.

  13. <u>Execution and Delivery</u>. This Second Amendment may be executed in two or more counterparts (whether by manuscript or electronic signature), each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. In the event that any signature is delivered by electronic means, or facsimile or e-mail transmission, such signature shall create a valid and binding obligation of the Party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile or digital signature page were an original signature.

  14. <u>Entire Agreement</u>. This Second Amendment together with the Base Agreement, the First Amendment, the Further Amendment and the Second Further Amendment (and the Equity Incentive Plan), constitute the full and complete agreement and understanding between the Parties concerning the subject matter hereof. Sections 7 through and including 21 of the Base Agreement as amended (except for Section 13), and Appendix 1, continue in full force and effect in all respects without amendment, modification, alteration, deletion, supplementation or clarification.

  15. <u>Miscellaneous</u>.

    (a) This Second Amendment (and the Agreement as amended) shall be governed by and construed and enforced in accordance with the laws of the State of Delaware, without regard to conflicts of law or principles thereof.

(b) The Company represents and warrants that this Second Amendment (and the Equity Incentive Plan) have been duly authorized by all necessary corporate action as applicable to the Company and that the person executing and delivering this Second Amendment on behalf of the Company has been authorized to do so.

(c) The Parties recognize and understand that this Second Amendment was prepared by Berger Singerman LLP, as counsel for the Company, based on negotiations between the Company and Executive and in collaboration with Executive's legal counsel, Sklover & Company, LLC. Executive recognizes and confirms that he was given every opportunity to have this Second Amendment (and the exhibits hereto) reviewed by his own counsel. No presumption shall be made as to the interpretation of any provision hereof on account of this Amendment or the exhibits having been prepared by counsel for the Company.

(d) As used in the Agreement, "business day" shall mean every day other than Saturday, Sunday or a holiday in which courts or other governmental offices are closed in Delaware.

(e) The obligations of the Parties to each other as set forth in this Agreement shall, unless otherwise expressly excepted in this Agreement, survive the termination of the employment relation between the Parties until fulfilled in their entirety.

SIGNATURES ON NEXT PAGE

9
10026473-12
Case 3:22-cv-01081   Document 1-2   Filed 12/30/22   Page 9 of 10 PageID #: 63

IN WITNESS WHEREOF, the respective Parties have authorized, executed and delivered this Second Amendment effective as of the Second Amendment Effective Date.

**EXECUTIVE:**

_____
**JAMES E. HYMAN**
Date: October 27, 2020

**COMPANY:**

**VALITAS HEALTH SERVICES, INC.**

By:_____
    Print Name and Title:
    Date: October __, 2020